LYONS, Justice.
AmerUs Life Insurance Company appeals from the trial court’s order denying its postjudgment motion for a judgment as a matter of law (“JML”), a new trial, or a *1202 remittitur. The trial court refused to set aside or modify a judgment entered on a jury verdict in favor of Bobby Ray Smith; Martha Smith, as trustee of the Bobby Ray Smith Family Trust;[1] and Precision Husky Corporation (hereinafter sometimes referred to as “the insureds”). We reverse and render a JML in favor of Ame-rUs.
I. Factual Background and Procedural History
In 1987, Carl Edward Jeffrey, an agent for Central Life Assurance Company (the predecessor corporation of AmerUs), contacted Bobby Ray Smith to solicit Smith’s purchase of life insurance. Jeffrey, an independent agent, represented a number of insurance companies, but he wrote the majority of his insurance policies through Central Life. Jeffrey was a member of the church where Smith served as the minister; Smith also operated his own business. When Smith met with Jeffrey to discuss purchasing life insurance, Smith already had a $3,000,000 life-insurance policy issued by Principal Mutual Life Insurance Company, which he canceled when he subsequently purchased insurance from Jeffrey. The Principal Mutual policy was issued at a standard rating and was pledged to a bank as security for a loan made by one of Smith’s businesses. Smith says that Jeffrey told him that he could provide him a better policy than the Principal Mutual policy and that Jeffrey showed him a written projection illustrating a $3,000,000 policy to be issued by Central Life that extended until Smith was 95 years old; Smith was then 53 years old. Smith says that Jeffrey represented to him that the policy would last for 42 years, that the annual premium would be $42,840, and that the annual premium would remain level for the entire 42 years. Smith completed an application dated January 6, 1987, for a policy with a death benefit of $3,500,000, which Jeffrey submitted to Central Life. Central Life agreed to issue the policy, but stated in a letter to Jeffrey that because of Smith’s medical history, the policy would be issued with a class “C” rating. Jeffrey then amended the application for the policy to reduce the requested coverage to $500,000. Jeffrey submitted another application dated March 24, 1987, for a $3,000,000 policy.
Pursuant to the applications, Central Life issued two policies insuring Smith’s life. The first policy, issued on April 14, 1987, had a death benefit of $500,000 (“the small policy”). The second policy, issued on May 19, 1987, had a death benefit of $3,000,000 (“the large policy”). Both policies were issued with a class “C” rating. Smith says that Jeffrey did not tell him that the policies did not have a standard rating or explain to him the meaning of a class “C” rating and that Jeffrey did not provide an amended illustration to show how the policy projections might differ from the original projections Jeffrey had showed him if the policy had a class “C” rating as compared to a standard rating. The rating class, a class “C,” appeared on the face of the policies.
Both policies issued to Smith by Central Life were flexible-premium adjustable life-insurance policies, known in the insurance industry as universal life-insurance policies. Both the premium and the death benefit are flexible in a universal life-insurance policy. Smith’s policies provided for the payment of a “planned premium.” AmerUs states that a planned premium is the product of a discussion between the agent and the client as to the amount of the premium the client wishes to pay for *1203 the policy. The premium is set in a range, with a minimum premium at the low range and a maximum premium at the high range.
Each of Smith’s policies advised: “Please read your policy carefully.” Each policy also contained a provision giving the insured 20 days to examine the policy and allowing the policy to be canceled “for any reason within 20 days after you receive it.” Smith stated that when he received the large policy, he looked at the declarations page, but that he did not otherwise read the policy. He also said that after Jeffrey delivered the policies to him, Jeffrey never told him that Central Life had not been able to provide a policy with the premium amount and the guaranteed period he and Jeffrey had discussed. Smith further stated that he never received any information from any source informing him that the policy terms as conveyed to him by Jeffrey were wrong.
The cover page of each policy describes it as a “FLEXIBLE PREMIUM ADJUSTABLE LIFE POLICY.” The schedule of benefits and premiums reflects a “planned premium” and a “payment period” of 42 years. The annual planned premium under the large policy was $42,840. The annual planned premium under the small policy was $5,739.96. Each policy also contained the following disclaimer:
“THIS POLICY MAY END BEFORE THE INSURED REACHES AGE 95 IF SUBSEQUENT PREMIUMS ARE NOT SUFFICIENT TO CONTINUE THIS POLICY IN FORCE UNTIL THAT TIME.”
Approximately a year after Central Life issued the large policy, Smith talked with Jeffrey about increasing its coverage to $3,500,000. Smith says that Jeffrey told him that he could obtain the additional coverage without any change in the planned premium. Smith also says that Jeffrey did not tell him that the additional '$500,000 in coverage would result in an 'increase in the cost of insurance that •would be deducted from the policy values. Smith then had the coverage on the large policy increased to $3,500,000.
When the policies were issued, Southern Comfort Conversions, Inc., a company in which Smith held a 50% interest, owned the small policy, and Precision Husky Corporation, the company in which Smith held a 100% interest, owned the large policy. Each company paid the premiums on the policy it owned. Southern Comfort transferred the small policy to Precision Husky in 1991. On December 29, 1993, Precision .Husky transferred both policies to Smith. The next day, he transferred ownership of both policies to his wife, Martha Smith, as trustee of the Bobby Ray Smith Family Trust. Thereafter, Bobby Ray Smith paid the premiums on both policies.
' Central Life sent annual statements concerning both policies, which Smith acknowledged receiving. The annual statements reflected, as early as 1988, that if only the planned premiums were paid, the policies would terminate well before Smith reached age 95. For example, the 1991 annual statement for the large policy advised that it would terminate in October '2004 if only the planned premiums were paid. Smith denied having read any of the annual statements, but admitted that if he had read them, he would have seen that if only the planned premiums were paid, the policies would lapse well before he reached age 95. Smith suffered a heart attack in 1989 and thereafter was unable to obtain other insurance to replace the policies. Smith testified that because he had become uninsurable, any information concerning the policies that he received after 1989 was irrelevant to him.
In 1991, George Brooks, another Central Life agent, called on Smith to solicit his *1204 insurance business. Brooks was an agent for Central Life from 1984 until 2005. Smith stated that he understood that Jeffrey was no longer associated with Central Life and that Brooks had “inherited” Jeffrey’s files. Brooks testified that he and Jeffrey were both employed as “career agents” with Central Life, which meant that the agent did the majority of his business with Central Life and received from the company health insurance and retirement-plan contributions. Brooks said that a career agent was more than just a soliciting agent, with the right to complete applications, sign them as a licensed agent, and turn them in to the company for acceptance. A career agent, he said, had binding authority that was higher than that of a typical insurance broker.
Brooks reviewed Smith’s insurance file, which included the small policy and the large policy, as well as the illustration that Jeffrey had used in his original sale of the policies to Smith. That illustration was premised upon a policy with a $3,000,000 death benefit, a $42,800 annual premium, and an interest rate of 8.5% projected to age 95. The illustration was based upon the assumption that the policy would be issued at a standard rate, but the policy was in fact issued at a higher class “C” rate because of Smith’s health conditions. Brooks testified that the effect of the higher class “C” rating was a 75% increase in the underlying cost-of-insurance expense. After reviewing Smith’s insurance file, Brooks stated that he concluded that the large policy would not extend for 42 years at the premium quoted by Jeffrey and that Jeffrey’s representation to Smith that the policy would pay a $3,500,000 death benefit with a stable premium for 42 years was not accurate. Likewise, Brooks concluded that the small policy also would not extend for 42 years at the premium quoted by Jeffrey.
During discussions in early 1991, Smith asked Brooks to obtain copies of the annual statements on the large policy and the small policy. Brooks did so, sending copies of the statements to Smith. The 1990 statements reflected that payment of the annual planned premium of $5,739.96 on the small policy would carry the policy only to December 2003 (approximately 26 years) and payment of the annual planned premium of $42,840 on the large policy would carry the policy only to November 2004 (approximately 27 years). Brooks also provided Smith with illustrations showing that a policy with a life-insurance benefit of $3.5 million based upon a projected premium of $42,000 per year would not extend to age 95. Brooks testified that, based on these illustrations, the annual statements, and other information, he informed Smith that his policies would not extend to age 95 with the level premiums quoted by Jeffrey. Smith said that Brooks told him that he might “have a problem down the road” and that he did not think that either policy would extend for 42 years without increasing the planned premiums. According to Brooks, Smith was concerned and seemed surprised when Brooks advised him that the premiums on the large policy and the small policy would not remain level for 42 years. Smith testified that he never would have purchased the policies if he had thought there would be a problem “down the road.”
Brooks stated that after advising Smith that the policies would not maintain coverage for 42 years at the fixed annual premiums as Jeffrey had represented, he discussed with Smith the options available to him: discontinuing the policies, seeking a lesser death benefit for the same premiums, paying higher premiums, or asking Central Life to lower the rating on the policies from a class “C” rating to a standard rating. Brooks testified that Smith *1205 seemed to understand the problems and his various options. Brooks tried to secure other insurance for Smith, but he was unsuccessful in obtaining coverage at a rate acceptable to Smith. Smith stated that he then made the judgment call to continue paying the premiums on the policies and to see how long they would last. According to Smith, the policies actually extended another 10 years after he made that decision. Smith said that he had trusted Jeffrey and had believed what Jeffrey had told him but that he did not believe what Brooks told him because he thought Brooks was just trying to sell him some insurance.
In 2001, Smith had additional discussions with Brooks. Brooks said that he informed Smith at that time that his policies would lapse within a few months, perhaps as long as a year. By then, AmerUs had acquired Central Life. Smith obtained legal counsel, who drafted a letter dated September 16, 2002, for Smith to send to AmerUs stating that he had been told his monthly premium payment on the large policy would not change for the life of the policy and that unless AmerUs agreed to continue the large policy in effect at the same premium he had been paying, he could not continue to maintain the policy. On September 25, AmerUs responded to Smith’s letter, advising him that the premiums were not sufficient to cover the cost of insurance and that the cash value had fallen below the amount necessary to sustain the payment of the premiums. Ame-rUs further advised Smith that in order to keep the large policy from lapsing, a payment of $24,905.75 would be required by October 12, 2002. Smith did not make any further premium payments, and both policies lapsed in October 2002.
The insureds sued AmerUs, Jeffrey, and the Jeffrey Planning Group, Inc. (a corporation owned by Jeffrey). The complaint alleged claims of fraudulent misrepresentation, fraudulent suppression, and breach of contract as to all defendants, and a claim of negligent and wanton hiring, training, or supervision of Jeffrey as to AmerUs. AmerUs answered the complaint, denying the allegations, denying any agency relationship with Jeffrey, and asserting various affirmative defenses, including a statute-of-limitations defense. Neither Jeffrey nor Jeffrey Planning ever answered the complaint.
AmerUs then filed a motion for a summary judgment. One of its arguments was that the insureds’ claims were barred by res judicata or collateral estoppel because of the settlement of a class action against AmerUs in which the insureds were members of the class. The trial court denied the motion, but allowed AmerUs to petition this Court for permission to appeal pursuant to Rule 5, Ala. R.App. P. This Court allowed the interlocutory appeal and affirmed the trial court’s order denying the summary-judgment motion, concluding that the insureds’ claims were not barred by the class-action settlement. AmerUs Life Ins. Co. v. Smith, 937 So.2d 510 (Ala.2006). The case then proceeded to a jury trial.
On the first day of trial, the insureds moved for the entry of a default judgment against Jeffrey and Jeffrey Planning. The trial court orally granted the insureds’ motion. Contending that Jeffrey had never been properly served, AmerUs sought to have the default judgment set aside. The trial court then set aside the default judgment and placed the insureds’ claims against Jeffrey and Jeffrey Planning on its administrative docket. Thereafter, the trial court, ex mero motu, ordered a separate trial for Jeffrey and Jeffrey Planning pursuant to Rule 42, Ala. R. Civ. P.
The case was tried on the insureds’ fraud claims and breach-of-contract claim *1206 against AmerUs. During the trial, the insureds introduced evidence that Smith had paid a total of $648,075.27 in premiums on the large policy and a total of $80,128.24 in premiums on the small policy. They also introduced schedules reflecting their calculations of interest Smith could have earned on the amount Smith had paid in premiums. Smith testified as to his mental anguish, stating only that when he received the letter from AmerUs in 2002, it gave him a “terrible feeling.” AmerUs' filed motions for a JML at the conclusion of the insureds’ evidence and at the conclusion of the case, but the trial court denied both motions.
After all evidence had been presented, Smith and Precision Husky moved to amend their complaint to add as a plaintiff Martha Smith, as trustee of the Bobby Ray Smith Family Trust, stating that the purpose of the amendment was “to simply specify that the trust is suing through Martha Smith, as the Trustee of the Bobby Ray Smith Trust.” The trial court allowed the amendment over AmerUs’s objection. The court refused to reopen the case to permit AmerUs to question the newly added plaintiff, but allowed the insureds to place Martha Smith’s 11-page deposition into the record.
The jury returned a verdict in favor of the insureds, awarding compensatory damages of $2,500,000 and punitive damages of $4,000,000.[2] The trial court entered a judgment on the verdict and certified the judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. AmerUs filed a post-judgment motion for a JML, a new trial, or a remittitur. The trial court denied the motion. AmerUs then appealed.
II. Standard of Revieiv
The dispositive issue in this case is whether AmerUs is entitled to a JML. This Court’s standard of review on a motion for a JML is well settled:
“When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997), Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as *1207 the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).
III. Analysis
We first address AmerUs’s argument that the insureds’ reliance upon the representations made by Jeffrey was unreasonable as a matter of law. In order to recover for fraud, the insureds needed to establish (1) that AmerUs made a false representation, (2) that the misrepresentation involved a material fact, (3) that the insureds relied on the misrepresentation, and (4) that the misrepresentation damaged the insureds. Liberty Nat’l Life Ins. Co. v. Ingram, 887 So.2d 222, 227 (Ala.2004). See also § 6-5-101, Ala.Code 1975. Moreover, a plaintiff must prove that he or she reasonably relied on the defendant’s misrepresentation in order to recover damages for fraud. This Court explained the reasonable-reliance principle in Torres v. State Farm & Casualty Co., 438 So.2d 757, 758-59 (Ala.1983):
“Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one’s own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs’ reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover. Bedwell Lumber Co. v. T & T Corporation, 386 So.2d 413, 415 (Ala.1980).
“ ‘If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, “volun-ti [sic] non fit injuria.” ’[3]
“Munroe v. Pritchett, 16 Ala. 785, 789 (1849).”
In Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), this Court overruled Hickox v. Stover, 551 So.2d 259 (Ala.1989), in which this Court had adopted a “justifiable-reliance” standard under which the plaintiff, to recover on a fraud cause of action, had to prove only that he or she had justifiably relied on the defendant’s misrepresentation. The Court stated:
“[W]e conclude that the ‘justifiable reliance’ standard adopted in Hickox [v. Stover, 551 So.2d 259 (Ala.1989) ], which eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial), should be replaced with the ‘reasonable reliance’ standard most closely associated with Torres v. State Farm Fire & Casualty Co., 438 So.2d 757 (Ala.1983). The ‘reasonable reliance’ standard is, in our view, a more practicable standard that will allow the fact-finder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and *1208 bargaining power of the parties. In addition, a return to the ‘reasonable reliance’ standard will once again provide a mechanism ... whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.”
Foremost, 693 So.2d at 421. Therefore, in order to satisfy the reliance element of their fraud claim, the insureds must show not only that they relied on Jeffrey’s alleged misrepresentation, but also that them reliance was reasonable in light of the facts surrounding the transaction in question.
The return to the reasonable-reliance standard imposes again on a plaintiff a “general duty ... to read the documents received in connection with a particular transaction,” Foremost, 693 So.2d at 421, together with a duty to inquire and investigate. “Fraud is deemed to have been discovered when the person either actually discovered, or when the person ought to or should have discovered, facts which would provoke inquiry by a person of ordinary prudence, and, by simple investigation of the facts, the fraud would have been discovered.” Gonzales v. U-J Chevrolet Co., 451 So.2d 244, 247 (Ala.1984). As this Court stated in Ex parte Caver, 742 So.2d 168, 172-73 (Ala.1999):
“Foremost ended the era of ‘ostrichism’ that had been heralded in when this Court adopted the ‘justifiable reliance’ standard in Hickox v. Stover, 551 So.2d 259 (Ala.1989), and it foreclosed the right of a person to blindly rely on an agent’s oral representations or silence to the exclusion of written disclosures in a policy.”
When reviewing a plaintiffs actions pursuant to the reasonable-reliance standard, this Court has consistently held that a plaintiff who is capable of reading documents, but who does not read them or investigate facts that should provoke inquiry, has not reasonably relied upon a defendant’s oral representations that contradict the written terms in the documents. In Traylor v. Bell, 518 So.2d 719 (Ala.1987), a case decided under the reasonable-reliance standard before Hickox, the plaintiff alleged that an automobile dealership had represented to him that it would sell him an automobile for a certain price but that the actual sales price was higher. The plaintiff signed the sales documents reflecting the higher price. He stated that he did not read the sales documents because he had only a fourth-grade education and was a poor reader and because he had poor eyesight that could not be corrected by glasses. However, he did not disclose those conditions to the dealership. This Court affirmed the trial court’s summary judgment in favor of the defendants, stating:
“If, indeed, in the final sales price charged to plaintiff there was a difference from what he understood it to be, that difference would have been easily discovered by even a casual reference by him to the sales price clearly indicated on the sales document which he signed. The fact that he did not make such a reference discloses an absence of that ordinary care which, had it been exercised, would have led to the discovery of any such difference, and the failure to exercise which renders his reliance unreasonable. The element of reasonable reliance being absent from the evidence, *1209 the trial court did not err in granting summary judgment.”
518 So.2d at 720-21.
In Alfa Life Insurance Corp. v. Green, 881 So.2d 987, 992-93 (Ala.2003), decided after this Court had readopted the reasonable-reliance standard in Foremost, the plaintiffs alleged that an insurance agent had represented to them that they would be required to make only nine annual premium payments for a life-insurance policy. The insurance company presented evidence indicating that the plaintiffs had been provided with a two-column premium schedule, one column showing the number of premiums they would have to pay if interest rates remained the same as the rates were when they purchased the policy, and one showing that premiums would be required for more than nine years if interest rates changed. One of the plaintiffs had an eleventh-grade education and had owned a tire business for 20 years and a hay business for 10 years; the other was a high-school graduate and had worked as a bookkeeper for 20 years. Both were 47 years old when they purchased the policy at issue; both could read and write. This Court held that the insurance company was entitled to a JML because the plaintiffs had not shown that they had reasonably relied on the alleged misrepresentations of the insurance agent.
In Ingram, 887 So.2d at 229, the plaintiff alleged that the insurance company had guaranteed that his policy would be “paid up” in 10 years and that he would not need to make additional payments beyond 10 years. The plaintiff had access to tables indicating cash values and insurance rates applicable to the policy he intended to purchase that contradicted what he alleged an agent had represented to him and that should have put the plaintiff on notice of the agent’s alleged misrepresentations. The plaintiff had the equivalent of a seventh-grade education, could read and write, was 52 years old when he purchased the policy, and had owned numerous insurance policies over the course of approximately 37 years. The Court held that the plaintiff had not presented substantial evidence indicating that he reasonably relied on what he was told by the agent regarding the number of premium payments required, and it reversed the trial court’s order denying the insurance company’s motion for a JML.
In Baker v. Metropolitan Life Insurance Co., 907 So.2d 419, 422-23 (Ala.2005), the plaintiff alleged that in selling him a policy, an insurance agent represented that after he had paid premiums for 11 years, the policy would become self-sustaining, and he would not have to pay any additional premiums. The insurance company presented evidence indicating that the plaintiff was presented with a premium schedule indicating that premiums were payable for 73 years, as well as a document describing choices available for paying premiums after 11 years so long as policy dividends were sufficient to support the alternative choices. The plaintiff was 27 years old when he applied for the policy, a high-school graduate, could read and write, and owned his own railroad-construction company. We held that in light of the information contained in the documents surrounding the transaction, the plaintiff had not produced substantial evidence indicating that his reliance on the agent’s alleged misrepresentation, if any, was reasonable. We therefore affirmed the summary judgment in favor of the insurance company and agent.
This Court has recognized one exception to the general rule that a plaintiffs reliance on the representations of a defendant is unreasonable when the plaintiff was in possession of documents the plaintiff could have read that were inconsistent *1210 with the statements on which the plaintiff alleges he relied. In Potter v. First Real Estate Co., 844 So.2d 540 (Ala.2002), the plaintiffs’ real-estate agent told them that she represented them as buyers as much as she represented the sellers of the property the plaintiffs were purchasing. Nevertheless, when she was asked whether the property being purchased was in a flood plain, the agent stated that it was not, showing the plaintiffs an almost illegible survey. The sales contract stated that the property was not in a flood plain. At the closing, the plaintiffs were provided with another copy of the survey, and the agent again assured them that the property was not in a flood plain, contrary to what appeared in a document presented at closing. Under those circumstances, we concluded that there was evidence of a special relationship between the plaintiffs and their acknowledged real-estate agent, together with evidence indicating that the agent had employed an artifice at the closing that lulled the plaintiffs into a false sense of security as to the contents of a document the plaintiffs were unable to read. We reversed the summary judgment in favor of the real-estate agent and her company. The exception to the rule discussed in Potter does not apply in this case, however, because Smith and Jeffrey do not have the kind of special relationship that was present between the plaintiffs and the defendant in Potter. Had Jeffrey been the minister and Smith the congregant, a different situation might exist, but that case is not presented here.
Chief Justice Cobb’s conclusion in her dissenting opinion that a confidential relationship exists between an insurance sales agent and the purchaser of insurance stemming from a preexisting relationship of congregant and minister is problematic in that it stands the typical role of a minister as the dominant figure giving spiritual advice on its head by making the congregant the dominant party in a discussion of secular affairs unrelated to spiritual concerns. Moreover, even assuming a confidential relationship existed between Jeffrey and Smith, the dissenting opinion misses the mark for a separate reason.
It is undisputed in this case that Jeffrey made no additional oral representations when the policy was delivered, unlike Potter, where the agent made additional representations at the closing. Chief Justice Cobb, in her dissenting opinion, states that the absence of misrepresentations at the time of delivery of the policy does not distinguish this case from Potter. The dissenting opinion concludes: “If the majority is of the opinion that Potter should not be the law, then instead of attempting to distinguish this case from Potter, it should overrule Potter.” 5 So.3d at 1220. This Court’s insistence upon conformity with a critical fact present in Potter and absent in this case to qualify for the exception recognized in Potter is by no means a retreat from Potter. Our opinion in Potter repeatedly emphasized the significance of the fact that misrepresentations were made at the time the documents were delivered. We stated:
“In our willingness to eliminate [the justifiable-reliance] standard that recognized a jury question whenever a plaintiff simply failed to read the agreement, we must avoid embracing a rule, inconsistent with our settled precedent, that would tolerate abuse of special relationships, particularly involving artifices to deceive as to the content of documents when presented at the time the agreement is memorialized.”
844 So.2d at 550 (emphasis added). We further stated:
“Under these circumstances, applying the standard in [Southern Building & Loan Ass’n v.] Dinsmore, [225 Ala. 550, *1211 144 So. 21 (1932),] as amplified in Holman [v. Joe Steele Realty, Inc., 485 So.2d 1142 (Ala.1986) ], we conclude that there is evidence of a special relationship between the Potters and Borden, evidence indicating that Joseph was unable to read an earlier version of a document that was presented again at the closing in a legible condition, evidence of renewed assurances that the document presented at the closing was consistent with the previous document described by Joseph as almost illegible. Suffice it to say that the conclusion reached in Holman, 485 So.2d at 1144 (‘there is no evidence of any misrepresentation of the content of the agreement or the employment of trick or artifice that would lull the Holmans into a false sense of security’) does not apply to these facts. Here there is sufficient evidence to warrant a determination by the jury that there was a ‘misrepresentation of the content of the agreement or the employment of trick or artifice’ at the time of the closing that lulled the Potters into a ‘false sense of security.’ ”
844 So.2d at 551-52 (emphasis added). Based on the foregoing, it cannot be said that today’s insistence on contemporaneous misrepresentations is a post hoc contrivance to limit the true holding in Potter. Indeed, if we were to accept the immateriality of silence at delivery, as the dissenting opinion contends, we would dramatically expand Potter and thereby revert to a post-Hickox /pre-Foremost standard of reliance.
The foregoing recognition of the significance of more than mere silence at delivery is not incompatible with the insureds’ view. In their brief the insureds demonstrated their awareness of Potter by citing it solely for an unrelated proposition of law dealing with standing to sue. Further, during oral argument in this case, the insureds’ attorney was questioned concerning the applicability of Potter to the facts presented by this case. The Justice posing the question described the facts in Potter as “a situation where at the closing of a real estate transaction, there were ' conversations about what those documents showed” and then asked, “That doesn’t ■appear to apply?” The insureds’ attorney replied, “That doesn’t appear.” In light of the foregoing, we simply cannot affirm the trial court’s judgment for the insureds ■ based on Potter.
AmerUs argues that the insureds’ reliance on Jeffrey’s alleged misrepresentations was not reasonable. Smith is a high-school graduate and was 53 years old at the time he purchased the policies. He had considerable business acumen, being a skilled businessman who had participated in million-dollar negotiations with banks and in acquisitions of companies, who had dealt with insurance agents in purchasing numerous life-insurance policies, and who had previously brought an action alleging fraudulent misrepresentations on the part of an insurance agent concerning a different policy. Smith presented no evidence indicating that he could not read the policies. Rather, he testified that he did not read them:
“Q. [By counsel for AmerUs:] So you had sued one insurance agent in 1984 who you trusted?
“A. Yes, sir.
“Q. And now you’re telling us you didn’t question at all the allegations of what Mr. Jeffrey told you?
“A. Not at all. No, sir.
“Q. Not at all. Even in light of you— Even having done that and having sued an insurance agent, you didn’t feel any need to look at these other documents?
“A. No, sir.
“Q. At all, did you?
*1212 “A. No, sir.
“Q. Do you take any responsibility for not looking at the other documents that Central Life sent to you at all, Mr. Smith?
[[Image here]]
“A. No, sir.
“Q. You take no responsibility for not having looked at those documents, even though you had previously had a bad experience with an agent you trusted with another company that you had to sue; is that right?
“A. It’s a whole different arrangement, but you’re correct in what you’re saying.”
AmerUs also argues that Smith could have reviewed, but did not review, the policies during the 20-day “free look” period provided for in the policies. In Ex parte Caver, 742 So.2d at 173, we concluded that if an insurance policy provides the insured an opportunity to examine it and to cancel it for a full premium refund if the insured does not agree with the provisions of the policy, and if the insured presents no evidence indicating that he or she could not have read and understood those provisions, then the insurer does not have an affirmative duty to orally inform the insured of the provisions of the policy. Both AmerUs policies had “free look” provisions. However, Smith testified that he reviewed only the declarations page of each policy.
“Q. [By counsel for the insureds:] When Mr. Jeffrey brought the policy to you, Bob, did he give you any documents and say, ‘Bob, I need you to look at these papers because we’re not able to do what we thought we were going to be able to do; we’ve had to do a different plan?’ Did he ever say that or show you any papers that indicated that to you?
“A. Never.
“Q. Now, there’s been some questions about the policy. Did you read every line of the policy?
“A. No, sir.
“Q. What did you look at on the policy when he delivered it to you?
“A. I looked at the front page or the second, whatever the — wherever the terms are.
“Q. When you looked at it, what did it show you?
“A. It showed me the amount of the policy was, indeed, what we had talked about. The premium was also what we talked about, and it was for a term of 42 years.”
Each policy insuring Smith’s life stated on the first page that it was issued pursuant to a “C Rating Class.” After the provision giving the insured 20 days in which to examine the policy, the initial page stated that the policy was a “FLEXIBLE PREMIUM ADJUSTABLE LIFE POLICY” and then stated:
“The insurance benefits are payable when the insured dies.
“Insurance benefits are adjustable. “Flexible premiums are payable to the Company for a specified period.
“Annual dividends.”
The schedule of benefits and premiums on the following page again indicated that the rating class of the policy was a “C” and that it was a “flexible premium adjustable life” plan. For the small policy, the schedule listed the amount of the benefit as $500,000 with an annual planned premium of $5,739.96, an initial premium of $478.33, a minimum monthly premium of $478.33, and a payment period of 42 years. For the large policy, the schedule listed the amount of the benefit as $3,000,000 with an annual planned premium of $42,840, an initial premium of $3,570, a minimum *1213 monthly premium of “$2,845,”[4] and a payment period of 42 years. Immediately below that information on both policies was the statement that the policy might end before the insured reached age 95 “if subsequent premiums are not sufficient to continue this policy in force until that time.” Each policy referred to the term “planned premium” as follows:
“Planned premium payments can be made during the Insured’s life and before the end of the payment period. Planned premiums can be scheduled for payment annually, semi-annually, quarterly, or monthly. We can limit the amount of any change in the planned premium.”
Each policy defined the “cost of insurance rate” as follows:
“The monthly rate is based on the Insured’s sex, attained age and risk class as determined by us for the initial face amount and each increase in face amount. The risk class with the most recent effective date will apply .... We can change the rates from time to time. The rates are determined by us according to expectations of future mortality, interest, persistency and expenses.... ”
Although Smith stated that he did not understand the language of the policies, he made it clear that it was not his practice to review an insurance policy after it was delivered to him. When asked to compare the language in the Central Life policies to the language in the Principal Mutual policy Smith had owned previously and had canceled when he purchased the Central Life policies, Smith testified:
“Q. [By counsel for AmerUs:] I want you to look at the face of this [Principal Mutual] policy. And where it says ‘modified premium whole life policy,’ if you would enlarge that, please. This type of policy tells you that the death benefit is stable at the death of insured, premiums payable for the period shown on page three, premiums increase for the first five policy years. And what does it say after that?
“A. ‘And remain level thereafter.’
“Q. That language ‘remain level’ is nowhere in the Central Life policy, is it? “A. If it is, I don’t know. I haven’t seen it.
“Q. But by having this policy, you knew that insurance policies were issued with the words ‘premiums remain level’ after a certain time, didn’t you?
“A. Sir, I have never read an insurance policy. I don’t know the answer to that question.
“Q. And you are telling these people that you have no responsibility whatsoever, even though you have never read an insurance policy?
“A. I do have some responsibility, and it was a mistake when I let Eddie Jeffrey represent me. That’s my responsibility.”
When the insured’s counsel produced the large policy and the small policy to AmerUs’s counsel in response to a discovery request, they also produced a document entitled “Statement of Policy Cost Benefit Information.” The cost-benefit statement is dated May 20, 1987, the day after the large policy was issued. It bears a number stamped with a Bates numbering machine indicating that it came from the insureds’ counsel, and the number im *1214 mediately follows the last stamped page number of the insurance policies. Smith denied having ever seen the cost-benefit statement, although he acknowledged that it had been produced by his lawyers to-' gether with the policies. A representative of AmerUs testified that it was standard company practice for the agent to deliver the cost-benefit statement at the time a policy was delivered. Smith does not contend that he did not receive the cost-benefit statement; indeed, he cannot so argue because the document was produced from his files.[5] Moreover, the insureds do not argue that whether Smith received the cost-benefit statement should have been a jury question.
The cost-benefit statement advised that the illustrated values might change with variations in interest rates, cost-of-insurance rates, and the frequency, timing, and amount of premium payments. The statement projected end-of-year policy values only to age 65 and contained the following cautionary statement warning that the policies would lapse before Smith reached age 95: “BASED ON GUARANTEED ASSUMPTIONS, THIS POLICY WILL LAPSE IN THE 6TH YEAR UNLESS A HIGHER PREMIUM IS PAID.” (Capitalization original.) Smith’s testimony that he did not see the cost-benefit statement must be considered in conjunction with his testimony that he had never read an insurance policy and that when he received the Central Life policies, his review consisted only of a cursory review of the declarations page. Smith’s testimony when asked about the cost-benefit statement confirms his reliance on Jeffrey’s oral representations despite contradictory language in the documents that were available to Smith:
“Q. [By counsel for AmerUs:] When you got this document and saw the guarantee was for five years only, did you think that you had been defrauded?
“A. When I got the document, if I got it — I don’t remember ever getting it, but it’s the day after the policy was issued. “Q. Right.
“A. If that had caused me any concern, I wouldn’t have gone through with the policy, Mr. Dauphin [counsel for Ame-rUs]. I had a perfectly good policy. It was fixed premiums. I’m not a fool, sir. You think I’m going to take something that I think is guaranteed for five years?
“Q. I think you didn’t look at it. Did you look at it?
“A. What’s wrong with trusting a man? ... I trusted Eddie Jeffrey. He said his policy was better.”
Smith acknowledged that if he had read the cost-benefit statement, he would have seen that it contradicted what Jeffrey had told him.
The insureds argue that the only evidence AmerUs provides in support of its argument that Smith’s reliance on Jeffrey’s representations was unreasonable “is the written words on the policies themselves.” The insureds’ brief at 59. The insureds rely on the declarations page of each policy, which they contend conforms to what Jeffrey represented to Smith. For the large policy, the declarations page on the policy Smith received in 1987 lists a coverage amount of $3,000,000, a planned premium of $42,840, and a payment period of 42 years. For the small policy, the declarations page lists a coverage amount of $500,000, a planned premium of $5,739.96, and a payment period of 42 years. Smith testified that when Jeffrey *1215 delivered the large policy, Smith looked at the policy and “[i]t showed me the amount of the policy was, indeed, what we had talked about. The premium was also what we talked about, and it was for a term of 42 years.... I understood there was a plan, if the premium was paid, that premium was paid every year up to 42 years. And that’s what I was told by Mr. Jeffrey.” Smith testified that he did not see anything that would have told him that the policy was going to terminate before 42 years even if he paid the premiums in the amount reflected on the declarations page. Smith testified similarly about the small policy. Smith also testified that Jeffrey never alerted him to any potential problems with the policies and that he did not see anything when he looked at the policies to indicate that his policies would end before the expiration of 42 years.
“Q. [By counsel for the insureds:] When Mr. Jeffrey brought the policy to you, Bob, did he give you any documents and say, ‘Bob, I need you to look at these papers because we’re not able to do what we thought we were going to be able to do; we’ve had to do a different plan?’ Did he ever say that or show you any papers that indicated that to you? “A. Never.
[[Image here]]
“Q. Do you see anything on here, Bob, based on your station in life and your education and your training, do you see anything here that would tell you that the policy is going to stop sometime before 42 years, even if you paid the $42,840 a year?
“A. No, sir, I didn’t.”
The insureds argue that in determining whether Smith’s reliance on Jeffrey’s alleged misrepresentations was reasonable, this Court should consider Brooks’s testimony that the Central Life policies were not readily understood by laymen. Brooks was asked: “If you read that policy, every single page of it, and read it line by line, is there anything in that policy that you have found that would tell the policyholder that what is represented on a schedule of benefits at the beginning is untrue?” Brooks answered: “No.” When asked whether he felt “that there was a lot of information at this point in time involving these types of policies that was misleading,” Brooks stated that he thought “there were things in the wording and the way things were laid out that allowed the individual to come up with the wrong assumption.” Brooks did not elaborate, however, on what “things” in the policies might allow an insured to draw inaccurate conclusions about the provisions of the policies. Brooks also stated that he thought most clients relied on their agents to interpret information from the company and that he felt that policyholders and customers had a right to believe what their agents told them.
The insureds argue that “AmerUs offered no testimony of its witnesses or any other evidence to show that, in light of the way the policy was written and the representations [that] were made by Mr. Jeffrey, Mr. Smith’s reliance was unreasonable.” The insureds’ brief at 63. Under Foremost, they say, the reasonableness of one’s reliance is what is reasonable under the facts or circumstances of the case. In this case, the insureds conclude, the jury heard both sides and obviously chose to believe that Smith’s reliance was reasonable.
What the jury chose to believe is irrelevant here, however, because the trial court erred in submitting the case to the jury for decision. In light of the language of the documents surrounding the insureds’ purchase of the life-insurance policies at issue in this case and the conflict between Jeffrey’s alleged misrepresentations and the documents presented to Smith, it cannot *1216 be said that Smith reasonably relied on Jeffrey’s representations. As this Court stated in Torres: “[T]he right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests.” 438 So.2d at 759. The insureds here took no precautions to safeguard their interests. If nothing else, the language in the policies and the cost-benefit statement should have provoked inquiry or a simple investigation of the facts by Smith. Instead, based upon the record before us, we must conclude that Smith “blindly trust[ed]” Jeffrey and “close[d] [his] eyes where ordinary diligence require[d] [him] to see.” Munroe v. Pritchett, 16 Ala. 785, 789 (1849). Moreover, the testimony of Brooks that “there were things in the wording [of the policies] and the way things were laid out that allowed the individual to come up with the wrong assumption” does not resolve the issue whether, as a matter of law, a reasonable person, upon reading the entire policy and the cost-benefit statement, would be put on inquiry as to the consistency of those documents with the previous representations by Jeffrey. Of course, if so, that person is then charged with knowledge of all of the information that the inquiry would have produced. Redman v. Federal Home Mortgage Corp., 765 So.2d 630, 634-35 (Ala.1999); Baxter v. Ft. Payne Co., 182 Ala. 249, 252-53, 62 So. 42, 43 (1913). We conclude that no reasonable person could read the policies and the cost-benefit statement and not be put on inquiry as to the existence of inconsistencies, thereby making reliance on Jeffrey’s representations unreasonable as a matter of law. Because the insureds failed to present substantial evidence indicating that Smith’s reliance on Jeffrey’s representations was reasonable, AmerUs is entitled to a JML.
IV. Conclusion
We reverse the trial court’s judgment for the insureds and render a judgment as a matter of law in favor of AmerUs. We therefore pretermit consideration of any other issues argued by AmerUs on appeal.[6]
REVERSED AND JUDGMENT RENDERED.
SEE, STUART, SMITH, BOLIN, and PARKER,[7] JJ., concur.
MURDOCK, J., concurs in the result.
COBB, C.J., dissents.
WOODALL, J., recuses himself.

. The complaint named as a plaintiff the Bobby Ray Smith Family Trust. Martha Smith, in her capacity as the trustee, was later substituted as a plaintiff in place of the trust.

. The court charged the jury on both the fraud claims and the breach-of-contract claim. The jury was specifically instructed that it could not return a verdict on the fraud claims and the breach-of-contract claim and was told that punitive damages could be awarded only on the fraud counts. AmerUs concluded that the jury’s verdict awarding both compensatory and punitive damages necessarily indicated that it found in favor of the plaintiffs solely on the fraud causes of action. We agree. Indeed, AmerUs, after referring to the trial court’s instruction and the resulting jury verdict for both compensatory and punitive damages, stated in its principal brief that it would present arguments primarily relating to the fraud claims. Smith, in his principal brief, mentions the breach-of-contract claim having been included in the initial complaint but does not thereafter refer to it.

. See Black’s Law Dictionary 1605 (8th ed.2004), defining the maxim "volenti non fit injuria" as "[t]he principle that a person who knowingly and voluntarily risks danger cannot recover for any resulting injury.”

. Although the schedule of benefits and premiums for the large policy states that the minimum monthly premium is $2,845, we note that 12 monthly payments of $2,845 equals $34,140. Twelve monthly payments of $3,570, the amount stated as the initial premium, equals $42,840 — the stated planned premium. There is no explanation in the record for that discrepancy.

. Because the insureds' receipt of the cost-benefit statement cannot be disputed, we are not here required to deal with cases regarding the sufficiency of proof of mailing that creates a presumption of receipt, such as Sisson v. State Farm Fire & Casualty Co., 824 So.2d 708 (Ala.2001), or Birmingham News Co. v. Moseley, 225 Ala. 45, 141 So. 689 (1932).

. Justice Murdock's special writing concurring in the result offers the tempting simplicity of resolving this appeal on the basis of the statute of limitations. Deciding the case on the basis that Smith's reliance on Jeffrey's representations was not reasonable eliminates the necessity of reaching complex questions as to the interest-sensitive nature of this policy and potentially the continuing validity of Williamson v. Indianapolis Life Insurance Co., 741 So.2d 1057 (Ala.1999), and its progeny, questions that are crucial to the conclusion reached by Justice Murdock.

. Although Justice Parker did not sit for oral argument of this case, he has viewed the video recording of that oral argument.