COBB, Chief Justice
(dissenting).
I respectfully dissent. I believe that, in affirming the summary judgement in this case, the majority improperly substitutes itself for the trier of fact. Since Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), the test for when an aggrieved person is charged with discovering fraud has been “reasonable reliance.”
“[T]he trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a *275 particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.”
693 So.2d at 421 (emphasis added).
The standard of appellate review of a summary judgment requires that we view the evidence most favorably in favor of the nonmovants, John A. Maloof, Jr., and Harriet Maloof, Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990). I emphasize that neither the trial court nor this Court is in the business of weighing the facts at the summary-judgment stage. That is, we should consider only whether the evidence offered in support of the summary-judgment motion is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Moreover, the nature of the misrepresentations constituting the fraud and suppression asserted by the Maloofs in this case is of particular note. Specifically, Parker Glasgow, an agent for John Hancock Insurance Company, represented that the policies would be in the Maloofs’ best financial interests and that the policies would supply benefits at John’s death of approximately $1,000,000. Although the policies and documents delivered to the Maloofs indicated that they might be subject to additional premium payments, representations by Glasgow indicated that the policies would become self-sustaining, and his October 30, 1992, letter to the Maloofs indicated that
“[the policy] is building up cash value and this cash value will help to keep the premiums level at a later date. It may be necessary to pay more into this policy in order for it to be maintained at the full death benefit level of $500,000 past age 74 according to current interest rates. I went over this with you in a letter February 7, 1990. However, the insurance amount could be reduced at some later date and that would have the effect of extending the policy for a longer period of time. For example, you could stop paying the premium at age 65, reduce the death benefit and, thereby, extend the coverage into your 80’s.”
(Emphasis supplied.)
Whether the policy language suggesting that additional premiums might be required negates a claim of fraud in light of this letter and the evidence concerning Glasgow’s representations is a genuine issue of material fact that precludes a summary judgment. The trier of fact could reasonably infer that Glasgow’s representations and letter do suggest that the policies will generate income sufficient to pay extra premium requirements so that the policies will remain in force in spite of any increased premium.
There is no evidence in this case suggesting that at the time John Maloof executed these policies he was informed, or should have reasonably been able to discover, that greatly increased premiums, premiums approaching the actual value of the policies, would be absolutely necessary in order to sustain the policies. Rather, the policies and the accompanying documentation note that “[t]he projected results of your insurance program may change significantly with variations in interest rates; mortality rates (risk charges); and the frequency, timing and amounts of premium payments.” Whether policy results may be “significantly” better or worse than expected was left to the speculation of the policyholder. In this case, of course, Glasgow’s speculation for John Maloof was that the policy would *276 generate such income that premium payments might be reduced or eliminated. However, the evidence presented by the Maloofs’ expert, Dr. David Lange, makes clear that these policies were so significantly underfunded that John Hancock knew at the time it issued the policies that significant additional payments would almost certainly be necessary. When asked about the language in Glasgow’s letter that premium payments “may be” required, Dr. Lange stated:
“But [Glasgow is] an insurance sales person who sold this policy and ran the illustration and would certainly be aware of the Statement of Policy Cost and Benefit Information and be aware the interest rates had declined.
“In fact, the — that this policy by ‘92, and since he had run a large number of illustrations in these various documents, he had to know from the beginning it wasn’t going to make it. It was going to make it to seventy-four or thereabouts. And since interest rates were coming down, was unlikely to do so. I’m amazed, absolutely amazed that he would use the phrase: ‘it may be necessary.’ ”
Further, when questioned about Glasgow’s representation that the policy period could be extended by a reduction in the death benefit, Dr. Lange stated, “It’s actually a complete falsity.”
A reasonable person could understand from this evidence that it was readily apparent to John Hancock and to Glasgow that the policies were so underfunded at the time they were issued that they would fail in the purpose intended for the Ma-loofs. Moreover, an insurance expert like Dr. Lange, trained in the mathematics of insurance policies, could also uncover this fact. However, when questioned about a layman’s ability to understand the policies, Dr. Lange stated:
“The difficulty I have with that is because of the calculations involved in there, that I’m not sure someone, even if they read it, would appreciate the mathematics involved.”
Thus, there is a genuine issue of material fact in this case as to whether the various documents supplied by John Hancock, including the policies and the annual statements and updates, disclosed facts from which a layman like John Maloof could discern that the policies were so underfunded that they could never serve his estate-planning purposes. Further, none of those documents directly contradict Glasgow’s representations that the policies would generate income that would significantly defray additional premium costs or that the policies could be extended at the same premium costs by reducing death benefits. None of the documents supplied to the Maloofs before the policies were canceled makes clear that huge increases in premium payments will absolutely be required in order to maintain the policies. In fact, the Maloofs became aware of the fraud and suppression asserted in their claims only when they received notice that the policies were being canceled unless the Maloofs paid substantial additional premiums. Further, this cancellation was to take place in spite of the fact that the Maloofs had timely paid all premiums required on the policies during the 18 years since the first policy was purchased.
In addition to my concern that the summary judgment incorrectly holds that there is no genuine issue of fact as to whether the Maloofs could have relied on the misrepresentations by Glasgow in this case, the above recitation of facts highlights the ambiguities in the instant policies, particularly from a layman’s perspective. Although the analysis of this issue does not involve a breach-of-contract claim, the majority’s conclusion that the policies *277 and the documentation from John Hancock are clear about the effect, or lack of effect, of these policies certainly flies in the face of the rule that ambiguities in an insurance contract are to be construed against the drafter of the contract. Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co., 817 So.2d 687, 695 (Ala.2001). See also Life Ins. Co. of Georgia v. Miller, 292 Ala. 525, 296 So.2d 900 (1974).
Although the trial court relied on AmerUS Life Insurance Co. v. Smith, 5 So.3d 1200 (Ala.2008), I believe that there are significant differences between the facts in this case and those in that case. In Ame-rUS, the plaintiff admitted that he did not read his policies, and the information supplied in the policy information directly contradicted the representations of the insurance agent. Thus, the Court concluded that the plaintiffs reliance on the agent’s representations could not, as a matter of law, be reasonable. This is not the case here. In this case, without the knowledge of an insurance expert, it is not clear that the representations that the policies would generate income that would significantly defray premium costs are inconsistent with the language in the policies that “[t]he projected results of your insurance program may change significantly....” Nor is it clear from the policies and subsequent documentation that the policies were so underfunded as to be, in the words’ of Dr. Lange, “DOA.”[3] In fact, Dr. Lange indicated that a layman could not easily comprehend the financial-outcome implications of the policies. Further, the increased premiums required to sustain the policy in AmerUS were approximately $25,000; in this case the amount of premiums necessary to extend John Maloofs million-dollar coverage until age 90 exceeded $1,036,000.
Moreover, the financial and business relationship between the plaintiff and the agent in AmerUS was not nearly as significant as the relationship between John Ma-loof and Parker Glasgow in this case. As I noted in my dissent in AmerUS Life Insurance Co. v. Smith, 5 So.3d at 1217, the reasonable-reliance standard adopted by the Court in Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), which imputes to a signatory the knowledge of the contents of a contract, is subject to certain exceptions. Potter v. First Real Estate Co., 844 So.2d 540 (Ala.2002).
“ ‘The instant case does not come within the rule of Southern Building & Loan Ass’n v. Dinsmore, 225 Ala. 550, 144 So. 21 (1932), that the law imputes no knowledge of a contract’s contents to a party who signs the contract without having read or having knowledge of its contents, if that party is lulled into a feeling of security because of a misrepresentation of the contents of the contract and because of special circumstances, relationships, or disability of the party relating to the contract’s execution. See also Arkel Land Co. v. Cagle, 445 So.2d 858 (Ala.1983); Rose v. Lewis, 157 Ala. 521, 48 So. 105 (1908).’ ”
AmerUS, 5 So.3d at 1217 (Cobb, C.J., dissenting) (quoting Holman v. Joe Steele Realty, Inc., 485 So.2d 1142, 1144 (Ala.1986)). As we recognized in Potter, supra, a special relationship between the contract signatory, here John Maloof, and the sales agent, here Parker Glasgow, can constitute an exception to the imputation of knowledge required by the reasonable-reliance standard. In Potter, the relationship was between the plaintiffs, a young married couple, and their real-estate agent, who misrepresented to them that the property that they sought to purchase was not located in a flood plain. Although that relationship was entirely contractual, the Court *278 determined that the nature of that relationship, in which the real-estate agent asserted that she represented the plaintiff buyers as much as she represented the seller, was such that there was a question for the trier of fact as to whether the buyers had notice of a survey showing that the property was located in a flood plain. Here, there is evidence in the record that could support the inference that John Ma-loof thought of Glasgow as just another insurance salesman. However, there is also evidence in this record indicating otherwise, and we must view all the evidence most favorably to the Maloofs, including John Maloofs testimony that he relied on Glasgow, Wilma Corp., supra. Under this standard, we consider only whether there is also evidence from which the jury could conclude that Glasgow had a special relationship with John Maloof that supported John Maloofs reliance on Glasgow’s assurance because the jury, as trier of fact, would be free to disregard other statements by John Maloof supporting a different inference.
In fact, the record shows that Glasgow had been John Maloofs exclusive insurance agent for some 20 years before the transactions at issue in this case and that he also served as John Maloofs “financial planner.” Further, John Maloof received reports, at least annually, from Glasgow concerning his financial interests and the effect of his insurance on his estate planning; Glasgow also participated in estate-planning meetings between John Maloof and his lawyer, and he contributed to those meetings by representing that the policies were valid additional assets of John Ma-loofs estate. As I noted in my dissent in AmerUS, the significance of a relationship of this type is entirely distinct from a single transaction between an insurance agent and a client; the relationship in this case is more of a special relationship than the “special relationship” based on a single transaction that this Court recognized in Potter. If the law in Potter concerning what constitutes a special relationship is no longer to be recognized, then Potter should be overruled. Accordingly, I believe that the question of Glasgow’s special relationship with John Maloof presents at least a question of fact as to whether John Maloof could have reasonably relied on Glasgow’s representations under the facts of this case.
Thus, I disagree that the difference in nature of the misrepresentations in this case and those in AmerUS are ultimately immaterial — in this case, unlike in Ame-rUS, there is a question of fact as to whether the policies and subsequent documents supplied to the Maloofs could reasonably be understood by one who did not have specialized knowledge of the mathematics underlying the policies; it is certainly not .apparent that the cost of keeping the policies would come to exceed the actual value of the policies in less than 20 years. The record also shows that Glasgow’s representations as to the performance of the policies was not directly contradicted by the policies and other documentation, and there is at least a question of fact as to whether Glasgow was in such a special relationship with John Maloof that the Maloofs’ reliance on the misrepresentations was reasonable under the circumstances. The question of reasonable reliance in this case is a question of fact to be decided by the trier of fact; reasonable reliance is not a standard that should be used to shield those who make false representations that they know, or should know, are untrue from the damage caused by their lies. The summary judgment in this case should be reversed. Therefore, I dissent.

. DOA is an acronym for "dead on arrival.”