STUART, Justice.
Harriet Maloof and John A. Maloof, Jr., sued John Hancock Life Insurance Company (“John Hancock”) and Parker A. Glasgow, an independent insurance agent, in the Jefferson Circuit Court, alleging fraudulent misrepresentation, suppression, breach of contract, negligent and/or wanton failure to procure insurance, and breach of fiduciary duties arising out of Glasgow’s sale of two universal life-insurance policies to the Maloofs in 1989 and 1992. The trial court entered a summary judgment in favor of John Hancock and Glasgow on all the claims, and the Maloofs appeal as to all the claims except the breach-of-contract claim. We affirm.
I.
John Maloof first became acquainted with Glasgow in approximately 1969 when they met at the University of Aabama at Birmingham Hospital where John worked as a cardiologist; Glasgow sold insurance to other physicians at the hospital. Over the next two decades, John purchased at least two life-insurance policies from Glasgow, as well as disability insurance. In 1989, after consulting with Glasgow, John elected to replace five existing life-insurance policies providing approximately $275,000 of coverage with two new policies issued by Manulife Financial.[1] When questioned by Glasgow’s attorney during his deposition, John explained that the object of these transactions was to provide funds to pay the estate taxes that would be due upon John’s death:
“The reason that these policies were even being discussed was because we were talking about estate planning and we got into a discussion of — of estate taxes and things like that. The entire reason for even considering these policies was to fund estate tax planning. Parker was kind enough to make me an appointment with [Birmingham attorney] Kirby Sevier, who’s an estate planner, and arranged it, and we went over there together. The whole purpose of the policies was to take care of estate planning. That was the reason for the policies.”
John also testified that Glasgow assured him that taking out these policies was in his and Harriet’s best financial interests. One of the policies purchased by John in 1989 was a $500,000 universal-life policy; the other policy was a renewable and convertible $500,000 term-life policy with an initial term of three years. In 1992, John purchased another $500,000 of life insurance from Manulife through Glasgow; this coverage was another universal-life policy with a face value of $250,000 and a $250,000 term rider. John stated in his deposition that this policy was also purchased as an estate-planning move to provide liquidity for any estate taxes due upon his death and that Glasgow again represented that it was in John’s best financial interests to purchase the policy. A1 the policies named Harriet as the beneficiary.
During the next several years, the Ma-loofs received quarterly bills for each of the three insurance polices and paid them as they came due. The quarterly payment for the 1989 universal-life policy was *266 $1,275.25, the quarterly payment for the 1992 universal-life policy was $1,418.14, and the quarterly payment for the 1989 term-life policy .was initially $493, but increased to $1,028 in 1992 and to $1,683 in 1995. In 1998, the Maloofs elected not to renew the term-life policy and it was canceled. Thereafter, the Maloofs continued to pay the quarterly bills for the two universal-life policies without incident until 2007.
On January 4, 2.007, the Maloofs made what would ultimately be their last quarterly payment of $1,418.14 on the 1992 universal-life policy, and on February 12, 2007, the Maloofs made what would ultimately be their last quarterly payment of $1,275.25 on the 1989 universal-life policy. The Maloofs subsequently received a notice from John Hancock dated February 13, 2007, notifying them that an additional premium payment of $5,265.12 was required by April 15, 2007, in order to continue the 1992 universal-life policy until July 13, 2007; otherwise, the notice informed them, the 1992 universal-life policy would terminate on April 15. They later received another notice from John Hancock, dated May 29, 2007, informing them that an additional premium payment of $7,573.15 was required by July 29, 2007, in order to continue the 1989 universal-life policy until November 29, 2007; otherwise, this notice informed them, that policy would terminate on July 29. After receiving these notices, John contacted Glasgow, who had retired in 2000, to inquire why his policies would be terminating, even though he had timely paid the premiums on the policies for approximately 18 years. John states that Glasgow told him that he would investigate the matter, and it appears that Glasgow did subsequently contact John Hancock; however, John states that Glasgow ultimately told him that there was nothing Glasgow could do. At his deposition, John testified that he decided not to pay the additional premiums requested by John Hancock to keep his policies in effect because doing so would essentially be “just throwing money away.” The Maloofs subsequently received notice from John Hancock that the 1992 universal-life policy was terminated on April 15, 2007, and that the 1989 universal-life policy was terminated on July 29, 2007.
On March 13, 2008, the Maloofs sued John Hancock and Glasgow in the Jefferson Circuit Court, alleging fraudulent misrepresentation, suppression, breach of contract, negligent and/or wanton failure to procure insurance, and breach of fiduciary duties arising out of their purchase of the universal-life policies in 1989 and 1992. The gravamen of their complaint was that Glasgow had misrepresented to them that purchasing those insurance policies was in their best financial interests and that the policies would provide benefits that would be available to pay any estate taxes due upon John’s death when, in fact, based upon the projected insurance and interest rates at the time of sale, those policies would likely lapse when John was approximately 78 years old unless the Maloofs at some point substantially increased the amount of the premiums they paid. On April 16, 2008, John Hancock moved the trial court to stay all proceedings pending a ruling from the United States District Court for the Southern District of California on whether the Maloofs’ action was barred by the settlement of a class action overseen by that court in 1998 in which allegedly deceptive sales practices used by Manulife between 1982 and 1993 were challenged; Glasgow subsequently joined in that motion. On June 19, 2008, the trial court entered a limited stay during which some preliminary discovery could still be conducted; however, that stay was lifted in its entirety effective November 19, 2008, after the United States District Court for *267 the Southern District of California held that the Maloofs’ claims were not covered by the settlement of the previous class action except to the extent that the Ma-loofs alleged that the contract charges on their life-insurance policies had been misrepresented.
On December 29, 2008, the trial court set an initial trial date of September 21, 2009; that trial date was later continued until February 1, 2010. On October 22, 2009, Glasgow and John Hancock filed their first formal answers to the Maloofs’ complaint. On November 2, 2009, the Ma-loofs moved to strike those answers, arguing that they were untimely under Rule 12(a), Ala. R. Civ. P., which requires defendants to “serve an answer within 30 days after the service of the summons and complaint.” Accordingly, the Maloofs argued, John Hancock and Glasgow’s answers were filed over 550 days late. On December 7, 2009, the trial- court denied the Maloofs’ motion. The Maloofs then petitioned this Court for a writ of mandamus directing the trial court to strike John Hancock’s and Glasgow’s answers as untimely; however, on January 22, 2010, this Court denied that petition, without an opinion (No. 1090375).
On November 24, 2009, Glasgow moved the trial court to enter a summary judgment in his favor on all counts, and, on November 25, 2009, John Hancock did the same. The Maloofs filed responses opposing the motions, but, on January 5, 2010, the trial court entered an order granting the motions of John Hancock and Glasgow and entering a summary judgment in their favor. On February 10, 2010, the Maloofs filed their notice of appeal to this Court.
II.
The Maloofs first make the general argument that the summary judgment entered by the trial court was erroneous because, they say, it. was based at least partly upon affirmative defenses asserted by John Hancock-and Glasgow; however, the Maloofs argue, those defenses had been effectively waived because John Hancock and Glasgow did not assert them until they filed their untimely answers more than 550 days after the answers were due. See Baldwin County Elec. Membership Corp. v. City of Fairhope, 999 So.2d 448, 461 (Ala.2008) (stating that the appellant had waived affirmative defenses first asserted in an untimely pleading). However, in both their motion to strike John Hancock’s and Glasgow’s answers and their brief filed with this Court, the Maloofs fail to address the significance of the stay entered by the trial court on June 19, 2008; rather, they argue only that the answers were late because they were not filed within 30 days after the summonses and complaints were served. In fact, the order entered by the trial court on June 19, 2008, granting a limited stay states that “either party shall file an appropriate d[i]spo-sit[i]ve pleading to the court” when the United States District Court for the Southern District of California ruled on John Hancock’s motion asserting that the Ma-loofs’ claims were part of a 1998 class action presided over by that court, thus indicating that the defendants’ obligations to file merits-related pleadings or motions were in abeyance during the duration of the stay. Accordingly, John Hancock’s and Glasgow’s answers were not late merely because, as the Maloofs argue, they were not filed by the 31st day after the Summonses and complaints were served. Instead, the relevant issue would instead be whether the answers were late because they were not filed for almost a year after the stay was lifted on November 19, 2008. However, this is not an issue that was raised by the Maloofs in either the trial court or in their brief filed with this Court. They instead have argued exclusively that *268 the answers were late because they were not filed within 30 days after the summonses and complaints were served. This Court will not consider an argument not raised in the trial court or in the appellate briefs; accordingly, there is no basis on which to hold that the trial court erred in failing to grant the Maloofs’ motion to strike John Hancock’s and Glasgow’s answers. See Yellow Dog Dev., LLC v. Bibb County, 871 So.2d 39, 41 (Ala.2003) (“[T]his Court will not ‘reverse a trial court’s judgment based on arguments not presented to the trial court or based on arguments not made to this [C]ourt.’ ” (quoting Brown v. Wal-Mart Stores, Inc., 864 So.2d 1100, 1104 (Ala.Civ.App.2002))).
III.
We next consider the Maloofs’ arguments that the trial court erred by entering a summary judgment in favor of John Hancock and Glasgow on the Ma-loofs’ fraudulent-misrepresentation and suppression claims, their negligent- and/or wanton-failure-to-procure-insurance claim, and their breach-of-fiduciary-duties claim; the Maloofs do not challenge the judgment entered on their breach-of-contract claim. We review these arguments pursuant to the following standard of review.
“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(e), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).
The Maloofs’ fraudulent-misrepresentation and suppression claims were premised on the allegation that Glasgow misrepresented to the Maloofs that the universal-life policies were in their best financial interests and that they would provide funds that would be available to pay the estate taxes due upon John’s death, while at the same time suppressing from them the facts that the policies were actually not in their best interests and that benefits from those policies would not be available to pay estate taxes due upon John’s death if he lived beyond approximately age 78. To merit consideration by a jury, both of these claims require some evidence of reasonable reliance, that is, that the Maloofs reasonably relied upon the alleged false representations, Boswell v. Liberty Nat’l Life Ins. Co., 643 So.2d 580, 581 (Ala.1994), or that they reasonably relied “on the state of affairs as it appeared in the absence of the suppressed information.” Houston County Health Care Auth. v. Williams, 961 So.2d 795, 814 (Ala.2006). In its order granting John Hancock’s and Glasgow’s motions for a summary judgment, the trial court explained its conclusion that evidence of reasonable reliance was lacking:
“Counts one and two of [the Maloofs’] complaint allege fraud and suppression, and the undisputed facts of this case *269 place it squarely within the facts and holding of the Alabama Supreme Court’s recent decision in AmerUS Life Insurance Co. v. Smith, 5 So.3d 1200 (Ala.2008). As in this case, AmerUS involved a plaintiff insured filing suit for substantially similar claims of fraudulent misrepresentation and suppression against his insurer and independent insurance agent. The similarities between the cases are striking insofar as: (1) both AmerUS and this case arise from the sale of universal life policies; (2) both AmerUS and this case involve misrepresentations as to the advisability of plaintiffs’ purchase of the universal life policies; the replacement of life insurance policies owned by the plaintiffs, the amount of premiums to be paid, and the length of time in which those premiums would carry the policies; (3) in both AmerUS and this case, the universal life policies were sold by independent insurance agents who were appointed to sell the products of the insurance company and who sold a substantial amount of business through the insurance company; (4) in both AmerUS and this case, the universal life policies issued by the insurance company called for the payment of ‘planned premiums’; (5) in both AmerUS and this case, the universal life policies advised the plaintiffs to read their policy carefully; (6) in both Ame-rUS and this case, the universal life policies provided the plaintiffs with a Tree-look’ provision; (7) in both Ame-rUS and this case, the universal life policies were self-described as ‘Flexible Premium Adjustable Life Policies’; (8) in both AmerUS and this case, the universal life policies contained statements disclosing that the policies would lapse if sufficient premiums were not paid to keep the policies in force; (9) in both AmerUS and this case, plaintiffs were provided documents both at the time of issuance of the policies and afterwards, including annual statements, showing the performance of the policies based upon assumed interest rates and indicating policy lapses, all -of which contradicted the alleged misrepresentations made by the insurance agent; and (10) in both AmerUS and this case, it was communicated to the plaintiffs that additional premiums beyond the planned premium would be required to sustain the policies. In AmerUS, the communication was verbal; here, the communication occurred in two separate letters in 1992 and 1997 written by the insurance agent and received and kept by the [Maloofs]. Based upon the holding in AmerUS and its overwhelming application to the present case, this court finds, as a matter of law, that [the Maloofs] cannot establish the necessary element of reasonable reliance in order to sustain their fraud and suppression claims. For these same reasons, [the Maloofs] were likewise put on notice of the alleged fraud more than two years prior to the commencement to this action, and, therefore, these claims are barred by the applicable statute of limitations.
“Additional grounds bar some of the misrepresentations claimed by [the Ma-loofs]. The statement allegedly made to plaintiff John Maloof as to what was in his best financial interests is a statement of opinion and not a statement of a material fact. Moreover, the statement that the policies would be available to pay estate taxes was not false because the universal life policies would have been available for such purposes if sufficient premiums had been paid.
“Other grounds likewise mandate dismissal of [the Maloofs’] suppression claims as [the Maloofs] have failed to offer substantial evidence to establish a duty to disclose by the defendants, and *270 the court finds that there was no special relationship between the insurance agent and the [Maloofs]. As to [the Maloofs’] claims regarding suppression of the policies’ contractual charges, [the Maloofs] agree that such claims are barred by the order entered earlier by the United States District Court for the Southern District of California and filed in this case.”
In their briefs to this Court, John Hancock and Glasgow reiterate the rationale of the trial court, while the Maloofs attempt to distinguish AmerUS Life Insurance Co. v. Smith, 5 So.3d 1200 (Ala.2008), arguing that the facts in this case are substantially different from the facts there and that reasonable reliance is a question for the jury. For the reasons that follow, we disagree.
Regardless of any oral misrepresentations that Glasgow may have made to convince the Maloofs to apply for new life-insurance policies, it is undisputed that the Maloofs had 20 days to review both the 1989 and 1992 universal-life policies after they received the policies and that they could cancel the policies at any time within that 20-day “free-look” period and receive a full refund of any premiums paid. Page three of both the 1989 and 1992 policies clearly states that “[t]his policy provides life insurance coverage for the lifetime of the life insured if sufficient premiums are paid. Premium payments in addition to the planned premium may need to be made to keep this policy and coverage in force.” (Emphasis added.) When questioned by Glasgow’s attorney about this language when he was deposed, John acknowledged that he understood its plain meaning:
“Q: What does that mean please, sir?
“A: It means you may have to pay more to keep the policy in force.
“Q: All right. And you have no trouble understanding that language?
“A: I understand it.
“Q: Okay. And so you would have understood back in [19]89, when you got this policy, that you may be required to make additional premium payments in the future, is that right?
“A: Yes.”
Moreover, within the 20-day free-look period the Maloofs had to review the 1989 and 1992 universal-life policies after receiving them, they also received a document produced by John Hancock labeled “Statement of Policy Cost and Benefit Information” for each policy. This document summarized the contract and surrender charges associated with the policy, as well as the expected life of the policy based on the premiums paid and interest rates and mortality rates applied. The document received in conjunction with the 1989 universal-life policy stated that the policy would lapse in approximately 4 years based on guaranteed interest rates and mortality rates, while the policy would lapse in approximately 18 years based on the current interest rates and mortality rates. The document received in conjunction with the 1992 universal-life policy stated that the policy would lapse in approximately 4 years based on guaranteed interest rates and mortality rates, while the policy would lapse in approximately 16 years based on the current interest rates and mortality rates. Both documents also contained the following disclaimer:
“The projected results of your insurance program may change significantly with variations in interest rates; mortality rates (risk charges); and the frequency, timing and amounts of premium payments. The projected values using ‘current rates’ are not guaranteed and the values with guaranteed rates are the *271 minimum that you will receive upon the surrender of the policy.
“Read your policy very carefully. In addition, there are other factors which could affect the projected values.”
John acknowledged in his deposition that the language of this disclaimer was “perfectly clear.”[2]
In AmerUS, this Court stated:
“In light of the language of the documents surrounding the insureds’ purchase of the life-insurance policies at issue in this case and the conflict between [the insurance agent’s] alleged misrepresentations and the documents presented to [the plaintiff], it cannot be said that [the plaintiff] reasonably relied on [the insurance agent’s] representations. As this Court stated in Torres [v. State Farm Fire & Cas. Co., 438 So.2d 757 (Ala.1983) ]: ‘[T]he right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests.’ 438 So.2d at 759. The insureds here took no precautions to safeguard their interests. If nothing else, the language in the policies and the cost-benefit statement should have provoked inquiry or a simple investigation of the facts by [the plaintiff]. Instead, based upon the record before us, we must conclude that [the plaintiff] ‘blindly trust[ed]’ [the insurance agent] and ‘close[d][his] eyes where ordinary diligence require[d] [him] to see.’ Munroe v. Pritchett, 16 Ala. 785, 789 (1849).... We conclude that no reasonable person could read the policies and the cost-benefit statement and not be put on inquiry as to the existence of inconsistencies, thereby making reliance on [the insurance agent’s] representations unreasonable as a matter of law. Because the insureds failed to present substantial evidence indicating that [the plaintiffs] reliance on [the insurance agent’s] representations was reasonable, [the life insurance company] is entitled to a JML.”
5 So.3d at 1215-16. We agree with the trial court that our holding in AmerUS controls here. The Maloofs argue that this case is different from AmerUS because the alleged misrepresentations were different; however, that fact is ultimately immaterial. The relevant inquiry is the same in both AmerUS and this case: whether it was reasonable for the insured to rely on an insurance agent’s representations about an insurance policy when those representations are contradicted by language in the insurance policy itself. This Court has repeatedly stated that it is not, not only in AmerUS, but also in Baker v. Metropolitan Life Insurance Co., 907 So.2d 419 (Ala.2005); Liberty National Life Insurance Co. v. Ingram, 887 So.2d 222 (Ala.2004); and Alfa Life Insurance Corp. v. Green, 881 So.2d 987 (Ala.2003).
The Maloofs claim that Glasgow misrepresented to them that the universal-life policies they purchased were in their best interests and that they would provide funds that would be available to pay the estate taxes due upon John’s death, while at the same time suppressing from them the facts that the policies were actually not in their best interests and that benefits from those policies would not be available to pay estate taxes due upon John’s death if he lived beyond approximately age 78. However, the Maloofs could not have rea *272 sonably relied on the alleged misrepresentations concerning the availability of benefits from those policies to pay estate taxes due upon John’s death in light of the clear language of the insurance policies. Moreover, with regard to Glasgow’s alleged misrepresentation that the purchase of the 1989 and 1992 universal-life policies was in the Maloofs’ best financial interests, we agree with the trial court that this was merely a statement of an opinion, not of a material fact. See State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 322-23 (Ala.1999) (holding that insurance agent’s statements that the purchased insurance policy was “the Cadillac of all insurance” and “the very best” amounted to mere puffery that could not reasonably be relied upon in light of the insured’s level of education and degree of sophistication). Accordingly, the trial court did not err by entering a summary judgment in favor of John Hancock and Glasgow on the Ma-loofs’ fraud claims.
The Maloofs have also argued that the trial court erred by entering a summary judgment in favor of John Hancock and Glasgow on their claim alleging that John Hancock and Glasgow negligently and/or wantonly failed to procure insurance for them. We have stated that “ ‘when an insurance agent or broker, with a view to compensation, undertakes to procure insurance for a client, and unjustifiably or negligently fails to do so, he becomes liable for any damages resulting therefrom.’ ” Crump v. Geer Bros., 336 So.2d 1091, 1093 (Ala.1976) (quoting Timmerman Ins. Agency, Inc. v. Miller, 285 Ala. 82, 85, 229 So.2d 475, 477 (1969)). The Maloofs allege that Glasgow agreed to procure life-insurance policies for them that would provide benefits available to pay estate taxes due upon John’s death; however, they argue, they now have no such life-insurance policies.
The undisputed facts indicate that Glasgow did in fact procure two universal life-insurance policies for the Maloofs and that, had the Maloofs continued to pay sufficient premiums on those policies, they would have remained in effect and the benefits of those policies would have been available for any purpose after John died. John Hancock did not spontaneously act to cancel the policies in 2007, nor did Glasgow take any action leading to their cancellation; rather, the Maloofs elected not to pay the increased premiums required to keep the policies in effect. There is no doubt that they made that decision with full knowledge of the fact that the failure to pay the increased premiums would lead to the cancellation of the policies. Thus, the undisputed facts indicate that Glasgow in fact fulfilled the Maloofs’ request to procure life-insurance policies that would provide funds that could be used to pay estate taxes upon John’s death, and those policies were canceled only after the Ma-loofs failed to pay the required premiums. John Hancock and Glasgow cannot be held liable for the negligent or wanton failure to procure insurance based on the Maloofs’ failure to pay the required premiums; accordingly, the summary judgment was' properly entered on this count.
The Maloofs’ final argument is that the trial court erred by entering a summary judgment in favor of John Hancock and Glasgow on the Maloofs’ claim that John Hancock and Glasgow breached certain duties owed to them because of their alleged fiduciary relationship with Glasgow, namely, the duty to disclose material facts related to the insurance policies and the duty to act in the Maloofs’ best interests. This Court discussed this claim in a similar context in Guinn v. American Integrity Insurance Co., 568 So.2d 760, 764 (Ala.1990), where we stated:
*273 “[The plaintiffs] breach of fiduciary-duty claim was premised on her allegation that her reposal of trust in [the defendant insurance agents] to advise her on what policies she should purchase, coupled with their acceptance of that trust, created a fiduciary relationship. She argues that her reliance, along with her advanced age, lack of mental strength, lack of knowledge of insurance matters, and the agents’ superior knowledge concerning insurance, constituted special circumstances that warranted the imposition of a fiduciary duty on [the agents].
“This Court has held that an insurance agent may be the agent of the insured, the insurer, or both. Washington National Ins. Co. v. Strickland, 491 So.2d 872, 874-75 (Ala.1985). However, an insurance agent is generally not considered to be an agent of the insured until a contract of insurance has been entered into. Strickland, supra; Highlands Underwriters Ins. Co. v. Elegante Inns, Inc., 361 So.2d 1060 (Ala.1978). Until such a contractual relationship has been established, the parties remain in the relationship of salesperson and prospective customer. The salesperson and his principal may be liable for damages if he misrepresents material facts in an attempt to induce the prospective customer to enter into the contract, Harrell v. Dodson, 398 So.2d 272 (Ala.1981); Ala.Code 1975, § 6-5-101 through 6-5-104. However, that potential liability does not indicate the existence of a fiduciary relationship.
“In addition, the existence of a duty is a question of law for the trial court. Berkel & Co. Contractors v. Providence Hospital, 454 So.2d 496 (Ala.1984); Hand v. Butts, 289 Ala. 653, 270 So.2d 789 (1972). Because [the plaintiff] failed to present evidence of a relationship between herself and [the defendant agents] that gave rise to a fiduciary duty, the court did not err in dismissing the claim based on an alleged fiduciary duty.”
For the reasons that follow, we similarly conclude in this case that there was insufficient evidence of a relationship between the parties that would give rise to fiduciary duties.
The Maloofs summarize their argument that they had a special relationship with Glasgow that gave rise to fiduciary duties as follows in their brief to this Court:
“For many years, [the Maloofs] entrusted their financial affairs and estate planning needs to Glasgow. His relationship with [the Maloofs] was far more confidential and complex than that of a mere insurance salesman. Glasgow indicated to the [Maloofs] that he was their ‘financial planner.’ Glasgow not only sold insurance products to the [Ma-loofs], but guided and advised [them] regarding important financial and estate planning affairs and decisions. He made insurance, financial and estate planning recommendations to the Ma-loofs. He referred them to a lawyer and made the appointment with the lawyer. He even went with the Maloofs to meet with the lawyer. He witnessed their wills. Their relationship far surpasses that of merely a ‘salesperson and prospective customer’ and does indeed give rise to a fiduciary duty. [Guinn, 568 So.2d] at 764. Glasgow’s relationship with [the Maloofs] is precisely the type that gives rise to a fiduciary duty.”
*274 “Every insurance agent I’ve ever known has had a lot of recommendations and a lot of promises and wants to sell me something and wants to get money and Parker [Glasgow] is no exception. So, I’m certain that when I talked to him he told me whatever was favorable that he wanted me to hear, and that’s the way it is. That’s — that’s the way it was. And Parker called. I would see him. I wouldn’t see him every time, but — because I knew that he wanted to sell me something. So, even though I liked him I’m not stupid and I knew he wanted to sell me something and I didn’t want to just buy something for no reason. So, I’m sure he explained to me whatever it was he thought that I should know or that I ought to know to make me buy the policy.”
*273 Maloofs’ brief, pp. 59-60. However, the Maloofs’ general contention that they had a trusting and confidential relationship with Glasgow is belied by the testimony John gave in his deposition regarding that relationship, where he made the following statements:
*274 “[T]here was a consistent record of trying to sell me policies, and for that reason there was a lot less credibility between me and Mr. Glasgow than there might have been otherwise.”
“My perception was that he wanted to sell me policies for whatever reason rather than the correct reason.”
“He was forever trying to sell me policies. Every time I saw him he had one idea after another selling — do this, do that, trade this in, do that. All he wanted to do was sell me policies and make a commission.”
“I always considered whatever [Glasgow] said. I took everything with a grain of salt.”
This testimony indicates that the Maloofs certainly did not view their relationship with Glasgow, though cordial and longstanding, as anything special or outside the typical salesperson-customer relationship. Combined with the facts in the record indicating that John is a well-educated professional and an experienced investor, we agree with the conclusion of the trial court that there was “no evidence that would justify the imposition of a fiduciary duty owed to [the Maloofs] by [John Hancock and Glasgow]” and that the summary judgment was accordingly proper.
IV.
The Maloofs sued John Hancock and Glasgow, alleging fraudulent misrepresentation, suppression, breach of contract, negligent and/or wanton failure to procure insurance, and breach of fiduciary duties arising out of Glasgow’s sale of certain life-insurance policies to the Maloofs in 1989 and 1992. After the trial court entered a summary judgment in favor of John Hancock and Glasgow on all the claims asserted by the Maloofs, the Maloofs appealed. Because no genuine issue of material fact exists, we affirm the judgment of the trial court.
AFFIRMED.
LYONS, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.
WOODALL, J., concurs in the result.
COBB, C.J., dissents.

. Manulife Financial acquired John Hancock in approximately 2004 and now conducts most of its business in the United States as John Hancock.

. John Hancock and Glasgow submitted additional evidence indicating that, over the approximately 18-year period between the time they purchased the first universal-life policy in 1989 and the time John testified that he realized his policy was in danger of lapsing in 2007, the Maloofs were sent other letters and documents indicating that the universal-life policies could lapse before John died.