[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-13984

Non-Argument Calendar

_____

SHERRI ELLIS,
SCOTT PETERS,

Plaintiffs-Third Party
Plaintiffs-Appellants,

versus

DR. JOHN CHAMBERS,
CYNTHIA CHAMBERS,

Defendants-Third Party Plaintiffs
Cross Defendants-Appellees,

———————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:19-cv-01776-CLM

———————————

Before NEWSOM, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

This appeal involving a failed home purchase is about assumptions. The sellers assumed that the buyers could easily obtain financing to purchase their home. The buyers assumed that the terms of a job offer would be acceptable. However, assumptions quite often to lead to disappointment and (occasionally) to litigation—as is the situation before us now.

Sherri Ellis and Scott Peters[1] entered a sales contract to sell their Alabama home to Dr. John and Cynthia Chambers. The Chamberses ultimately were unable to obtain financing and the deal fell through. The Peterses sold their house to another purchaser for less money than the Chamberses had offered. The Peterses then sued the Chamberses for breach of contract, fraudulent inducement, and fraudulent suppression under

---

[1] The district court referred to Appellants as "the Peters[es]," for ease of reference, because Ms. Ellis and Mr. Peters were married at all times relevant to this appeal. We will do the same.

Alabama law.  The district court granted summary judgment to the Chamberses on all three counts.  The district court also denied various motions, which the Peterses take issue with on appeal. After review, we affirm.

## I.    BACKGROUND

In 2018, the Alabama Bone and Joint Clinic ("ABJC"), along with Shelby Baptist Hospital ("the Hospital"), recruited Dr. John Chambers, a spine surgeon, to relocate his practice from Indiana to Birmingham, Alabama.   Dr. Chambers engaged in various discussions with Dr. Daryl Dykes, a principal of ABJC, to discuss the terms of the proposed joint venture.  During the recruitment process the Chamberses worked with Kim Barelare, a licensed real estate agent, then affiliated with LAH Real Estate ("LAH"), to find a home in Alabama.  The Chamberses signed a Buyer's Agency Agreement[2] with Barelare and LAH but, when Barelare transferred to a different brokerage firm, Keller Williams, the Chamberses did not sign another Buyer's Agency Agreement.

After communications with Dr. Dykes and others at ABJC, Dr. Chambers signed a Letter of Intent ("LOI") in January 2019. The LOI outlined the basic terms of the joint venture with ABJC and stated that the terms were subject to a "Definitive Agreement"

---

[2] A buyer's agency agreement is an agreement between the home buyer and a real estate agent defining the terms of the relationship between the parties. This initial Buyer's Agency Agreement is not part of the record because, according to Ms. Barelare, the copy of the agreement was lost in a flood.

with the Hospital.  Dr. Chambers received the ABJC employment contract on February 4, 2019, and ABJC informed him that the agreement was "contingent upon execution of" a forthcoming agreement with the Hospital, which would provide "more details" related to various other employment terms.

Dr. Dykes testified that during the period of negotiations, he discussed the "basic" terms that the Hospital agreement would contain, including that the agreement would contain the "[m]ain components of th[e] Letter of Intent."

Sherri Ellis and Scott Peters, represented by their real estate agent, Melvin Upchurch, had a home for sale in Birmingham.  On or about April 11, 2019, Ms. Barelare informed Mr. Upchurch that she had a potential buyer, Dr. Chambers, who was pre-approved for a mortgage and interested in the home but could not make an offer until he had secured satisfactory employment arrangements.

Dr. Chambers orally accepted an updated LOI in April 2019,[3] gave written notice of resignation to his practice in Indiana, and applied for his Alabama medical license and privileges at the Hospital.  On April 29, 2019, ABJC sent Dr. Chambers an updated employment agreement, which needed to be signed at the same time as the Hospital agreement.  Dr. Chambers still had not yet received the Hospital agreement.  Sometime in late April 2019, Ms.

---

[3] ABJC and the Hospital sent a second LOI on April 22, 2019, reflecting an increased annual salary.

Barelare informed Mr. Upchurch that Dr. Chambers had made satisfactory employment arrangements in Alabama and was ready to negotiate a sales contract.

On May 5, 2019, Ms. Barelare sent a text message to Mr. Upchurch containing the terms of the Chamberses' offer, including that there would be "[n]o contingencies except home inspection. That is all." Mr. Upchurch forwarded this text message to Ms. Ellis the same day, to which Ms. Ellis responded "Ok let me know when you get it in writing. I was always taught it wasn't a contract until in writing . . . . I'll talk to Scott. And let you know." Ms. Barelare testified that she asked Dr. Chambers if he wanted to include an employment contingency in the offer, but Dr. Chambers declined, expressing his desire that the sales contract be simple and clean for the sellers to accept.

On May 11, 2019, following a period of negotiations, the parties entered a sales contract, in which the Chamberses agreed to purchase the Peterses' house for $1.9 million along with $60,000.00 worth of furniture. In addition to the home inspection contingency, the sales contract included a financing contingency allowing either party to cancel the contract if the Chamberses could not obtain financing by the date of closing. The sales contract specified a closing date of June 28, 2019.

The Chamberses applied for a conventional mortgage loan. Their mortgage application was approved subject to several conditions, including receipt of "proof [that] the Definitive Agreement with [Dr. Chambers's] new employer has been fully

executed and . . . [a] letter from [the] new employer stating all contingencies have been met."

In early June 2019, Dr. Chambers was informed that the Hospital General Counsel was finalizing the Hospital agreement. Given the delay, Dr. Chambers then applied for a home equity line of credit that would serve as a "bridge loan." Dr. Chambers was conditionally approved for the bridge loan, which was contingent on verification of Alabama employment and certification. He understood that this loan would facilitate a faster closing allowing the Chamberses to refinance the loan with a conventional mortgage at a later date.

Dr. Chambers received the Hospital's Definitive Agreement on or around June 17, 2019, at which time he forwarded it to his attorney for review. Dr. Chambers took issue with several terms in the Hospital agreement, including restrictions on his ability to transfer to another orthopedic practice in Birmingham if the ABJC joint venture fell through.[4] As a result, Dr. Chambers did not sign

---

[4] Essentially, as Dr. Chambers understood it, the agreement would permit ABJC to terminate him for any reason and then restrict his ability to work for another practice or start his own in the Birmingham area. Dr. Chambers also understood the agreement to trigger repayment obligations following termination, contrary to what Dr. Dykes relayed during negotiations in early 2019.

the employment agreements before the agreed upon closing date and thus could not obtain financing.[5]

The Chamberses paid the Peterses a nonrefundable $5,000.00 deposit in consideration for a two-week extension of the closing date so Dr. Chambers could continue to negotiate the employment agreements. However, Dr. Chambers did not reach an agreement with the Hospital so the Chamberses failed to obtain financing for a second time. The Peterses sold their house to another buyer for $1.8 million. Dr. Chambers, after unsuccessfully attempting to negotiate the terms of the employment agreements, returned to his practice in Indiana.

The Peterses then filed a suit for breach of contract in Alabama state court, alleging that the Chamberses breached the sales contract when they refused to close on the sale of the Peterses' home. The Chamberses removed the case to federal court on the basis of diversity jurisdiction. The Peterses later amended their complaint to add claims for fraudulent inducement and fraudulent suppression.

The Chamberses moved for summary judgment and the district court granted the motion on all counts. With respect to their breach of contract claim, the district court found that the Chamberses made a reasonable, good faith effort to obtain

_____

[5] Nor did Dr. Chambers obtain financing through the bridge loan, as he failed to provide employment certification.

financing.   As for their fraud-based claims, the district court concluded that Ms. Barelare's statements were not attributable to the Chamberses such that they were liable for fraud or, alternatively, that the written sales contract superseded previous written communications between Ms. Barelare and Mr. Upchurch.

The Chamberses also moved to strike the testimony and declaration of the Peterses' expert witness, Maddox Casey, whom the Peterses offered to testify on the purported reasonableness of the employment agreements.   The Chamberses moved to strike Mr. Casey on the grounds that his report was conclusory, he did not identify the documents upon which he relied, and the Peterses failed to carry their burden of proving that Mr. Casey was reliable. They also asserted that Mr. Casey's declaration was untimely, as it contained opinions based upon knowledge obtained after the close of discovery.   The district court denied this motion as moot because consideration of the testimony and declaration did not change its summary judgment rulings.

For their part, the Peterses moved to exclude paragraphs 38 through 42 of Dr. Chambers's declaration and to strike or disregard the Chamberses' summary judgment arguments related to those paragraphs.   The Peterses argued that the paragraphs and related arguments directly contradicted the Chamberses' responses to requests for admission under Federal Rule of Civil Procedure 36. The district court denied this motion, finding that the declaration and summary judgment arguments did not conflict with the responses to requests for admission.

Lastly, the Peterses moved to compel discovery seeking all oral and written communications between the Chamberses and their attorney about the sales contract and Dr. Chambers's employment agreements. They argued that the Chamberses waived attorney-client privilege in Dr. Chambers's declaration by relying on the advice of counsel to prove they acted in good faith. The district court denied the motion because Dr. Chambers's declaration did not reveal the contents of the communications with the Chamberses' attorney and the Chamberses did not rely on their attorney's legal advice as a defense. The Peterses timely appealed.

## II.    DISCUSSION

### A. Summary Judgment

"We review a district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party." *Hubbard v. Bayer HealthCare Pharms. Inc.*, 983 F.3d 1223, 1232 (11th Cir. 2020). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1177 (11th Cir. 2020) (quotation omitted).

### 1.  Breach of Contract

Under Alabama law,[6] in order to prevail on their breach of contract claim, the Peterses must prove these elements: "(1) the existence of a valid contract binding the parties in the action, (2) [their] own performance under the contract, (3) the defendant[s'] nonperformance, and (4) damages." *Southern Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995).

"[C]ontract provision[s] making the contract subject to the procurement of a loan to finance the purchase price" are "valid condition[s] precedent to performance." *Duncan v. Rossuck*, 621 So. 2d 1313, 1314 (Ala. 1993).  Implicit in this condition is the purchaser's "duty to attempt to obtain financing through a reasonable good faith effort." *Id.* (citing *Schottland v. Lucas*, 396 So. 2d 72 (Ala. 1981)).  "[W]hen a contract makes securing financing a condition precedent to its performance, neither the contract nor any of its provisions become binding obligations unless and until financing is obtained." *Ex parte Bill Heard Chevrolet, Inc.*, 927 So. 2d 792, 799 (Ala. 2005).  Conditional approval for a loan does not satisfy a financing contingency. *See Khalidi v. Weeks Fam. P'ship*, 912 So. 2d 256, 261 (Ala. Civ. App. 2005).

First, it is clear under the plain language of the home purchase contract that the financing contingency was not satisfied. The Chamberses indisputably did not obtain financing by the date

---

[6] The parties do not dispute that Alabama law applies.

of closing and did not waive the financing contingency. The issue here, then, is whether the Chamberses fulfilled their "duty to attempt to obtain financing through a reasonable good faith effort." *Duncan*, 621 So. 2d at 1314. We agree with the district court that they made a reasonable good faith effort.

In the Peterses' view, Dr. Chambers rejected in bad faith the proposed employment agreements from ABJC and the Hospital in an attempt to get out of purchasing the Peterses' home. They contend that the district court improperly determined that Dr. Chambers's receipt of the Hospital agreement, which contained new and unfavorable terms, constituted "an unanticipated change in circumstances" arising only after execution of the home purchase contract to excuse the Chamberses' failure to obtain financing. Instead, they contend that, because Dr. Chambers had "actual knowledge" of the provisions of the Hospital agreement before signing the home purchase contract,[7] the Chamberses could not have acted in good faith in refusing to sign the employment contracts, thus dooming their efforts to obtain financing.

The Alabama Supreme Court has found bad faith in two circumstances arising in the context of financing contingencies in home purchase agreements. First, in *Schottland v. Lucas*, the Alabama Supreme Court held that where the purchasers refused to

---

[7] The Peterses contend that Dr. Chambers had actual knowledge by virtue of his communications with Dr. Dykes during negotiations and Dr. Chambers's receipt of ABJC's agreement.

sign a loan application, the facts of the case supported the inference that defendants frustrated the financing contingency and did not make a reasonable good faith effort. 396 So. 2d at 74. Second, in *Duncan v. Rossuck*, the court held that where evidence in the record demonstrated that the purchasers rejected financing "solely because they wished to be relieved from performing under a contract that they had become disenchanted with," the defendants were not excused from the contract for failure of the financing contingency. 621 So. 2d at 1314–15.

Conversely, in *Carmichael v. Lambert Construction Co.*, the Alabama Supreme Court held that where, following execution of a home purchase contract, the purchasers applied for financing but then were unexpectedly informed by the husband's employer that he would be transferred to another state, the purchasers did not "voluntarily prevent[ ] or frustrate[ ] the occurrence of the" financing contingency by failing to obtain financing. 487 So. 2d 1367, 1368–69 (Ala. 1986).

Here, the record establishes that the Chamberses acted in good faith. The Peters have not pointed to any evidence sufficient to create a genuine dispute of material fact on this issue. The Peterses contend that Dr. Chambers was fully apprised of the substantive terms of the Hospital agreement before execution of the sales contract through his discussions with Dr. Dykes. The record, however, shows that the parties entered into the sales contract in May 2019, one month prior to Dr. Chambers receiving the Definitive Agreement from the Hospital. While Dr. Dykes

testified that he discussed the "basic" terms of the Hospital agreement with Dr. Chambers as they were described in the LOI, the final agreement included additional terms beyond those in the LOI—some of which were directly contradictory to what Dr. Dykes discussed with Dr. Chambers.

The Peterses point to other facts in the record as evidence of the Chamberses' bad faith—namely, Ms. Barelare's statements that Dr. Chambers would not sign a sales contract before making satisfactory employment arrangements and that, in early May 2019, Dr. Chambers had made such arrangements and was ready to negotiate a sales contract. They also point to Dr. Chambers's instruction to Ms. Barelare not to include an employment contingency in the sales contract.

These facts do not support a reasonable inference that the Chamberses acted in bad faith in pursuing financing to purchase the Peterses' home. Before signing the sales contract, Dr. Chambers believed that he had made satisfactory employment arrangements. While understanding that the Hospital agreement would contain additional terms, he believed the substance of those terms would align closely with what he discussed with Dr. Dykes and ABJC during negotiations as those terms were described in the LOI. After signing the sales contract, however, he learned that the Hospital agreement contained unfavorable terms.

Unlike the purchasers in *Duncan* or *Schottland*, the record shows that the Chamberses did not thwart their application for financing or reject an offer of financing simply because they

became "disenchanted" with the sales contract.  This case is much more like *Carmichael*, where an unanticipated change in circumstances led to the Chamberses' failure to obtain financing. What's more, there are additional facts in the record here that support a finding of good faith that were not present in *Carmichael*. For instance, the Chamberses applied for a bridge loan to close on the Peterses' home more quickly, they did not seek to terminate their loan applications when Dr. Chambers's employment negotiations stalled, and they sought an extension of the closing date for which they paid a nonrefundable deposit as consideration. On summary judgment, we must draw all inferences in favor of the Peterses, as the non-moving party; however, the facts relied upon by the Peterses do not have probative value sufficient to create a fact issue precluding summary judgment on this claim.[8]

---

[8] The Peterses argue that the Chamberses are estopped from relying on failure of the financing contingency because the Chamberses "misrepresented that there was no employment contingency and . . . they concealed their intent to condition their performance on the" employment agreements which were "subjectively agreeable to Dr. Chambers."  This argument is meritless.

The Chamberses could not have misrepresented that the sales contract did not contain an employment contingency because the sales contract did not, in fact, contain such a contingency.  The Peterses seem to argue that there was an unwritten and undisclosed employment contingency in the sales contract, implying a term that the Chamberses would not close on the house if Dr. Chambers did not finalize his employment in Alabama.  First, we are confined to the four corners of the sales contract when interpreting its terms, assuming there is no ambiguity.  *See, e.g.*, *Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 490 (Ala. 2020).  There is no employment contingency in the sales

### 2. Fraud Claims

For both their fraudulent inducement and fraudulent suppression claims, the Peterses rely on two statements made by Ms. Barelare: first, the oral statement from Ms. Barelare to Mr. Upchurch that Dr. Chambers had made satisfactory employment arrangements and was prepared to begin moving forward on a sales contract; and second, the text message from Ms. Barelare to Mr. Upchurch that there are "no contingencies except home inspection." The Peterses contend these statements are not true because (1) Dr. Chambers had not yet made employment arrangements satisfactory to him; and (2) the Chamberses knew that they would not sign a sales contract without having secured employment (effectively enforcing an unwritten employment contingency). The purported purpose of these alleged misrepresentations "was to present a 'clean'" sales contract while Dr. Chambers continued to negotiate more favorable employment terms. The Peterses also contend the Chamberses suppressed the actual status of Dr. Chambers's employment.

Under Alabama law, a plaintiff must prove these elements of fraud: "(1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation." *Deng v. Scroggins*, 169 So. 3d

---

contract. Second, "contingency" has a unique meaning in the context of real estate transactions. Whether the Peterses believe that there was an unwritten "contingency" at work is of no consequence.

1015, 1024 (Ala. 2014). "Moreover, a plaintiff must prove that he or she reasonably relied on the defendant's misrepresentation in order to recover damages for fraud." *AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1207 (Ala. 2008). Alabama uses a reasonable reliance standard, asking whether the plaintiff's "reliance was *reasonable* in light of the facts surrounding the transaction in question." *Id.* at 1208 (emphasis in original).

Fraud in the inducement, a creature of fraud under Alabama law, exists where one party misrepresents "a material fact concerning the subject matter of [an] underlying transaction" and the other party "rel[ies] on the misrepresentation to his . . . detriment in . . . taking a course of action." *Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala. 2000) (emphasis omitted). "In Alabama, it is not always necessary to prove that a misrepresentation was made directly to the person who claims to have been injured." *Thomas v. Halstead*, 605 So. 2d 1181, 1184 (Ala. 1992). Rather, "[i]f a third person is injured by the deceit, he may recover against the one who made possible the damages to him by practicing the deceit in the first place." *Id.* (internal quotations omitted).

Fraudulent suppression, on the other hand, requires proof of (1) a defendant's duty to disclose "an existing material fact"; (2) the defendant's concealment or suppression of that material fact; (3) the plaintiff's reliance on the suppression in choosing to act or refraining from acting; and (4) damage suffered by the plaintiff. *Alabama Psychiatric Servs., P.C. v. 412 S. Ct. St., LLC*, 81 So. 3d

1239, 1247 (Ala. 2011). "A duty to disclose can arise either from a confidential relationship with the plaintiff or from the particular circumstances of the case." *Ex parte Farmers Exch. Bank*, 783 So. 2d 24, 27 (Ala. 2000). When a defendant does not have a duty to disclose because of a confidential relationship, the defendant "may nevertheless be liable for fraudulent concealment if he knowingly takes action to conceal a material fact that has been requested of him by the plaintiff and does so with the intent to deceive or mislead the plaintiff." *Id.* at 28. "[T]he existence of a duty is a question of law to be determined by the trial judge." *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 839 (Ala. 1998).

The district court concluded that the Peterses' claims for fraudulent inducement and fraudulent suppression failed because they were premised on Barelare's communications. Because no agency relationship existed under Alabama's Real Estate Consumers Agency and Disclosure Act ("RECAD"), Ala. Code. § 34-27-80 *et seq.*, Barelare's statements could not be attributed to the Chamberses.

We first address the applicability of RECAD to this claim. RECAD provides that an agency relationship exists between a real estate agent and a consumer only when the parties enter a signed, written agency agreement. Ala. Code § 34-27-82(b). Under the statute, "[a]n agency relationship shall not be assumed, implied, or created without a written bilateral agreement establishing the terms of the agency relationship." *Id.* RECAD defines "agency agreement" as "[a] written agreement between a broker and a

client which creates a fiduciary relationship between the broker and a principal, who is commonly referred to as a client." *Id.* § 34-27-81(1). Until such an agreement is entered, the real estate agent is a transaction broker for purposes of the transaction. *Id.* § 34-27-82(b). The statute defines "transaction broker" as "[a] licensee who assists one or more parties in a contemplated real estate transaction **without being an agent** or fiduciary or advocate for the interest of that party to a transaction." *Id.* § 34-27-81(17) (emphasis added). The statute defines "licensee" as "any broker, salesperson, or company." *Id.* § 34-27-81(10). RECAD further specifies that "[i]n the absence of a signed brokerage agreement between the parties, the transaction brokerage relationship shall remain in effect." *Id.* § 34-27-82(e). RECAD supersedes all inconsistent common law agency principles. *Id.* § 34-27-87.

The Peterses contend that RECAD is not applicable to this case. RECAD, however, supersedes common law agency principles in the real estate context. Therefore, under RECAD, an agency relationship between Ms. Barelare and the Chamberses could not exist without an applicable buyer's agency agreement such that Ms. Barelare's statements could be attributable to the Chamberses. It is undisputed that the Chamberses did not sign a buyer's agency agreement with Keller Williams when Ms. Barelare left LAH and changed brokerages. Because buyer's agency agreements are between brokers and clients, *id.* § 34-27-81(1), the signed agreement between the Chamberses and LAH could not and did not create an agency relationship when Ms. Barelare

transferred to Keller Williams. Her alleged misrepresentations made to Mr. Upchurch, therefore, are not imputable to the Chamberses.

But even if we were to accept the Peterses' contention RECAD does not apply, their claims would fail.

### a. Fraudulent inducement

First, the Peterses have not established that when Dr. Chambers informed Ms. Barelare that he had made satisfactory employment arrangements (or when Ms. Barelare subsequently informed Mr. Upchurch of this information), the statement was false when made. The record shows that Dr. Chambers did, in fact, believe he had made satisfactory employment arrangements. Given the information he had received prior to receiving the Hospital agreement, Dr. Chambers believed in May 2019 that he would be moving to Alabama to join ABJC and that he would accordingly enter into the ABJC and Hospital agreements. Indeed, he applied for his Alabama medical license, applied for hospital privileges in Alabama, and resigned from his partnership in Indiana. The record does not support a reasonable inference that Ms. Barelare (or Dr. Chambers through Ms. Barelare) misrepresented an existing fact in making this statement.

Further, the Peterses have failed to establish that Ms. Barelare's text message stating "[n]o contingencies except home inspection" contained any affirmative misrepresentation. It is clear that the Peterses assumed that the agreement would not contain

an employment contingency and that the Chamberses would easily obtain financing to purchase the Peterses' home. The Peterses, however, have not established that it was reasonable to rely on what they assumed from the text message—that the home purchase contract would not contain an employment contingency. Indeed, the agreement contained no such contingency. The Peterses essentially argue that, through this text message, the Chamberses somehow represented through their real estate agent that Dr. Chambers had secured employment and would easily obtain financing, obviating the need for a run-of-the-mill financing contingency. The Peterses' assumption is not supported by record evidence. For these reasons, their fraudulent inducement claim fails, and the district court's grant of summary judgment was proper.

### b. Fraudulent suppression

Lastly, as for the Peterses' fraudulent suppression claim, they have not pointed to any evidence to show that the Chamberses owed the Peterses any duty to disclose the status of Dr. Chambers's employment. The Peterses contend that a duty to disclose arose through the Chamberses' "elect[ion] to speak, or speak in half-truths." However, it is indisputable that the Peterses and the Chamberses were not in a confidential relationship such that duty to disclose arose as a matter of law. Further, the Peterses have not alleged that they ever requested information from the Chamberses regarding Dr. Chambers's employment status that might have given rise to the Chamberses' duty to disclose such

information. *See Farmers Exch.*, 783 So. 2d at 28. If they wished to know more about the status of Dr. Chambers's employment negotiations, they could have readily requested that information, but they did not do so.

Accordingly, the district court's grant of summary judgment on the fraudulent suppression claim was proper.

## B. *Motion to Strike Testimony and Declaration of Plaintiff's Expert*

The Peterses appeal the district court's denial as moot of the Chamberses' motion to strike the testimony and declaration of Maddox Casey, the Peterses' expert witness. The district court denied this motion as moot because consideration of Mr. Casey's testimony and declaration would not have changed the result of its opinion.[9]

Mr. Casey's opinions and testimony discuss his conclusion that the terms of the ABJC and Hospital agreements "were fair and reasonable and fully consistent with standard and customary contracting practices of medical groups and hospital systems in Birmingham, Alabama with physicians in general and in particular,

---

[9] The parties do not agree on which standard of review we should apply to a district court's decision to deny as moot a motion to strike expert opinions and testimony. The Peterses contend that we should apply de novo review, while the Chamberses contend that we should review for abuse of discretion. We need not decide which standard of review applies, as we discern no error under even a de novo standard.

with orthopedic surgeons . . . ."  These opinions and testimony are unnecessary to our conclusion that summary judgment on all three counts was proper on the grounds we have already discussed. Therefore, we affirm the district court's denial of the Chamberses' motion to strike as moot.

## C. Motion to Exclude

The Peterses challenge the district court's denial of their motion to exclude certain paragraphs of Dr. Chambers's declaration and related arguments in the Chamberses' motion for summary judgment.  In support of their motion for summary judgment, the Chamberses submitted a declaration of Dr. Chambers.  The challenged paragraphs describe Dr. Chambers's understanding, following a conference call with his wife and their attorney, of the substance of the ABJC and Hospital agreements and how the agreements worked together.  The Peterses contend that because those paragraphs directly contradict the Chamberses' responses to requests for admission in which they denied seeking legal counsel on the breach of contract claim, the fraud claims, and punitive damages, they should have been excluded.  They also sought exclusion of the portions of the Chamberses' motion for summary judgment that relied on those paragraphs.

The district court denied their motion because it determined that there was no direct contradiction between the filings—the Chamberses denied in their responses to requests for admission that they sought legal advice on the claims involved here, but Dr.

Chambers's declaration shows only that he sought legal advice on the employment agreements.  We agree.

We review the district court's decision to strike an affidavit for an abuse of discretion. *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1259 (11th Cir. 2004).  Admissions to requests for admission pursuant to Federal Rule of Civil Procedure 36 are controlling in the presence of conflicting subsequent testimony.  *See Williams v. City of Dothan*, 818 F.2d 755, 762 (11th Cir. 1987).  However, there is no conflict between the Chamberses' Rule 36 admissions and Dr. Chambers's declaration.  The Chamberses admitted pursuant to Rule 36 that they did not seek legal advice for the claims brought against them by the Peterses.  The Peterses did not seek admissions that Dr. Chambers sought legal advice regarding his employment agreements, which is what Dr. Chambers declared in support of the Chamberses' motion for summary judgment.  The district court did not abuse its discretion in denying the Peterses' motion to strike and we therefore affirm.

## D. Motion to Compel

The Peterses appeal the district court's denial of their motion to compel all oral and written communications between the Chamberses and their lawyer regarding Dr. Chambers's employment agreements and the sales contract.  The Peterses argue that the Chamberses waived attorney-client privilege and that they are entitled to the requested communications because in his declaration Dr. Chambers described his understanding of the

employment agreements following a conference call with his attorney.

The district court denied the motion to compel on the grounds that the Chamberses did not waive attorney-client privilege because Dr. Chambers's declaration did not reveal the contents of the communication with his attorney.

We review a district court's denial of a motion to compel discovery for abuse of discretion. *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 837 (11th Cir. 2006). "This means that a district court is allowed a range of choice in such matters, and we will not second-guess the district court's actions unless they reflect a clear error of judgment." *Id.*  Under Alabama law,[10] attorney-client privilege may be waived by the client if the client discloses the content of the communication. *See Ex parte Great Am. Surplus Lines Ins. Co.*, 540 So. 2d 1357, 1359 (Ala. 1989) (quotation omitted).  Under the Federal Rules of Evidence, the waiver of attorney-client privilege

> extends to an undisclosed communication or information in a federal or state proceeding only if:
>
> (1) the waiver is intentional;
>
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and

---

[10] State law governs the application of attorney-client privilege in civil matters. Fed. R. Evid. 501.

(3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a).

The district court did not abuse its discretion in denying the motion to compel on the grounds that the declaration did not reveal the contents of the communications between the Chamberses and their attorney. Rather, the declaration merely describes Dr. Chambers's understanding of the employment agreements following his conversations with his attorney. For instance, in paragraph 41 of his declaration, Dr. Chambers states after reviewing the contract with his attorney, "a clear picture emerged" of the substance of the agreements for him and his wife. In paragraph 42, Dr. Chambers states that "after our telephone conferences with our attorney on June 26, 2019, *I understood the following* . . . ," proceeding to describe how he understood the employment agreements to operate. Dr. Chambers did not reveal the contents of the communications with their attorney nor did he reveal the substance of any legal counsel he received during the communications. The Chamberses therefore did not waive attorney-client privilege such that the Peterses are entitled to discovery of their privileged communications with their attorney.

## III.    CONCLUSION

The district court's grant of summary judgment on the Peterses' breach of contract, fraudulent inducement, and fraudulent suppression claims was proper. The district court's denial of the Chamberses' motion to strike the testimony and

declaration of the Peterses' expert witness was also proper.  It was not an abuse of discretion for the district court to deny the Peterses' motion to exclude and motion to compel.  For these reasons, we affirm.

**AFFIRMED.**